**ORAL ARGUMENT NOT YET SCHEDULED**

# In the United States Court of Appeals for the District of Columbia Circuit

**No. 14-1275**

_____

SIERRA CLUB AND GALVESTON BAYKEEPER,
*Petitioners*,
*v.*
FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*,
AMERICAN PETROLEUM INSTITUTE, *et al.*,
*Intervenors*.

_____

## ON PETITION FOR REVIEW OF ORDERS OF THE FEDERAL ENERGY REGULATORY COMMISSION

_____

## BRIEF OF PETITIONERS
## SIERRA CLUB and GALVESTON BAYKEEPER

_____

Nathan Matthews
Sierra Club Environmental Law
    Program
85 Second Street, Second Floor
San Francisco, CA 94105-3456
Telephone: (415) 977-5695
Facsimile: (415) 977-5793
nathan.matthews@sierraclub.org

Michael Robinson-Dorn
University of California
Irvine School of Law
Environmental Law Clinic
401 E. Peltason Drive, Suite 4500
Irvine, CA 92697-8000
Telephone: (949) 824-1043
mrobinsondorn@law.uci.edu

Deborah A. Sivas
Alicia E. Thesing
Matthew J. Sanders
Environmental Law Clinic
Mills Legal Clinic at
    Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone: (650) 723-0325
Facsimile: (650) 723-4426
dsivas@stanford.edu

March 13, 2015

# <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

A.    Parties

      1.    Petitioners

           Sierra Club
           Galveston Baykeeper

      2.    Respondent

           Federal Energy Regulatory Commission

      3.    Intervenors

           American Petroleum Institute
           Freeport LNG Development, L.P.
           FLNG Liquefaction, LLC
           FLNG Liquefaction 2, LLC
           FLNG Liquefaction 3, LLC

B.    Rulings Under Review

      1.    Order Granting Authorizations Under Section 3 of the Natural Gas Act, *Freeport LNG Development, L.P.*, 148 FERC ¶ 61,076 (July 30, 2014); and

      2.    Order Denying Rehearing and Clarification, *Freeport LNG Development, L.P.*, 149 FERC 61,119 (Nov. 13, 2014).

C.    Statement of Related Cases

      To the best of counsel's knowledge, there are no related cases pending before this court.

Respectfully submitted,

_____

Nathan Matthews
Sierra Club Environmental Law
   Program
85 Second Street, Second Floor
San Francisco, CA 94105-3456
Telephone: (415) 977-5695
Facsimile: (415) 977-5793

Deborah A. Sivas
Alicia E. Thesing
Matthew J. Sanders
Environmental Law Clinic
Mills Legal Clinic at Stanford
   Law School
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone: (650) 723-0325
Facsimile: (650) 723-4426

Michael Robinson-Dorn
University of California
Irvine School of Law
Environmental Law Clinic
401 E. Peltason Drive, Suite 4500
Irvine, CA 92697-8000
Telephone: (949) 824-1043

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .................................................................................. i

TABLE OF CONTENTS ...................................................... iii

TABLE OF CASES, STATUTES, AND AUTHORITIES ......................... v

INTRODUCTION ................................................................ 1

LEGAL BACKGROUND ......................................................... 2

I. The Natural Gas Act .......................................................... 2

II. The National Environmental Policy Act ............................... 4

III. FERC and Department of Energy Coordination of Natural Gas Act and NEPA Review ........................................................ 6

FACTUAL BACKGROUND .................................................... 7

I. Freeport LNG Import Project .............................................. 7

II. The Shale Gas Boom ........................................................ 8

III. The Energy Information Administration's Liquefied Natural Gas Export Study ............................................................. 9

IV. The Freeport LNG Export Project ..................................... 13

SUMMARY OF ARGUMENT ............................................... 17

STANDARD OF REVIEW ................................................... 19

ARGUMENT .................................................................... 7

I. FERC Violated NEPA by Failing to Consider Foreseeable Indirect Impacts from the Project .......................................... 18

A. The Project Will Cause Foreseeable Changes in the Domestic Natural Gas Market and Associated Emissions Impacts ...................... 19

B. Project-Induced Increases in Domestic Gas Production Will Have Foreseeable Adverse Effects on Greenhouse Gas Emissions and Ozone Levels ........................................................................ 22

C. The Project's Exportation of Natural Gas Will Foreseeably Increase Coal Consumption, Causing Additional Ozone and Climate Impacts.......................................................................... 29

II. FERC Failed to Consider the Cumulative Impacts that the Freeport Project Will Cause Together with Other Foreseeable Export Projects....................................................................... 32

III. FERC Failed to Inform Decisionmakers and the Public of the Project's Total Air Pollution By Failing to Quantify Air Pollution Related to the Project's Electricity Consumption.................................. 35

_Toc414042242

CONCLUSION.......................................................................... 38

## TABLE OF CASES, STATUTES, AND AUTHORITIES

**Page(s)**

**Cases**

*Airlines for America v. Transp. Security Admin.*,
___ F.3d ___, Docket 14-1143, Slip. Op. 3-4 (D.C. Cir. Mar. 10, 2015)..................................................................................28, 36

*Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*,
462 U.S. 87 (1983) ................................................................... 6

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*,
449 F.2d 1109 (D.C. Cir. 1971)........................................... 52

*City of Davis v. Coleman*,
521 F.2d 661 (9th Cir. 1975)..........................................37, 39

*Del. Riverkeeper Network v. FERC*,
753 F.3d 1304 (D.C. Cir. 2014)........................................... 26

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .........................................................23, 24

*Friends of the Earth, Inc. v. U.S. Army Corps of Eng'r*,
109 F. Supp. 2d. 30 (D.D.C. 2000).......................................... 7

*Hammond v. Norton*,
370 F. Supp. 2d 226 (D.D.C. 2005)...................................... 53

*Hunt v. Wash. State Apple Adver. Comm'n*,
432 U.S. 333 (1977) ............................................................ 23

*Kilroy v. Ruckelshaus*,
738 F.2d 1448 (9th Cir. 1984)............................................ 52

Petitioners did not chiefly rely on any particular authority.

*Kleppe v. Sierra Club*,
   427 U.S. 390 (1976) ................................................................ 48

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................ 24

*Mich. Gambling Opposition v. Kempthorne*,
   525 F.3d 23 (D.C. Cir. 2008) ........................................... 6, 46

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
   345 F.3d 520 (8th Cir. 2003) ............................ 7, 29, 30, 34

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.
Auto. Ins. Co.*,
   463 U.S. 29 (1983) .................................................................. 26

*N. Air Cargo v. U.S. Postal Serv.*,
   674 F.3d 852 (D.C. Cir. 2012) ............................................ 26

*NAACP v. Fed. Power Comm'n*,
   425 U.S. 662 (1976) .................................................................. 5

*NRDC v. Callaway*,
   524 F.2d 79 (2d Cir. 1975) .................................................. 48

*Pac. Shores Subdivision Cal. Water District v. Army Corps of
Engineers*,
   448 F. Supp. 2d 1 (D.D.C. 2006) ....................................... 16

*Sabine Pass Liquefaction, LLC and Sabine Pass LNG, L.P.*,
   139 FERC ¶ 61,039 (2012) ........................................... 18, 50

*Sabine Pass Liquefaction, LLC and Sabine Pass LNG, L.P.*,
   146 FERC ¶ 61,117 (Feb. 20, 2012) ........................... 18, 50

*Save Our Sonoran v. Flowers*,
   408 F.3d 1113 (9th Cir. 2005) .................................... 34, 46

*Scientists' Inst. for Pub. Info. v. Atomic Energy Comm'n*,
   481 F.2d 1079 (D.C. Cir. 1973) ..................................... 7, 31

*Sierra Club v. E.P.A.*,
  774 F.3d 383 (7th Cir. 2014)................................................................ 40

*Sierra Club v. Mainella*,
  459 F. Supp. 2d 76 (D.D.C. 2006)...................................................... 52

*Sierra Club v. Marsh*,
  769 F.2d 868 (1st Cir. 1985) ................................................................ 7

*TOMAC v. Norton*,
  240 F. Supp. 2d 45 (D.D.C. 2003) *aff'd sub nom. TOMAC -
  Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d
  852 (D.C. Cir. 2006).............................................................................. 6

*United Gas Pipe Line Co. v. McCombs*,
  442 U.S. 529 (1979) .............................................................................. 4

*WildEarth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013)............................................................ 24

**Statutes**

15 U.S.C. § 717b(3) ................................................................................ 1

15 U.S.C. § 717b(a) ............................................................................. 4, 5

15 U.S.C. § 717b(c) ................................................................................ 5

15 U.S.C. § 717r(b)............................................................................ 1, 25

42 U.S.C. § 4331(a) ................................................................................ 5

42 U.S.C. § 4332................................................................................... 52

42 U.S.C. § 4332(2)(C) ...................................................................... 6, 33

National Environmental Policy Act (NEPA), 42 U.S.C. §
  4321 *et seq.*.............................................................................. *passim*

Natural Gas Act, 15 U.S.C. § 717b ............................................... 4, 5, 8, 9

## Federal Regulations

40 C.F.R. § 1502.1 ................................................................... 52

40 C.F.R. § 1502.14 ................................................................. 52

40 C.F.R. § 1502.14 ................................................................... 6

40 CFR 1508.7 ........................................................................ 48

40 C.F.R. § 1508.8 ............................................................... 6. 51

40 C.F.R. § 1508.8(b) ......................................................... 6, 36

40 C.F.R. § 1502.22 ............................................................ 7, 31

40 C.F.R. § 1502.22(a) ............................................................ 42

EPA, Comment on Final EIS for Freeport LNG Liquefaction
   Project, 2 (July 28, 2014) ................................................. 39

## Federal Register Publications

EPA, *Endangerment and Cause or Contribute Findings for
   Greenhouse Gases under Section 202(a) of the Clean Air
   Act*; Final Rule, 74 Fed. Reg. 66496 (Dec. 15, 2009) ........................... 43

EPA, *Finding of Significant Contribution and Rulemaking
   for Certain States in the Ozone Transport Assessment
   Group Region for Purposes of Reducing Regional
   Transport of Ozone*, 62 Fed. Reg. 60,318, 60,326 (Nov. 7,
   1997) ................................................................................. 40

DOE, *Import and Export of Natural Gas; New
   Administrative Procedures; Proposed Rule*, 46 Fed. Reg.
   44696, 44700 (Sept. 4, 1981) ......................................... 8, 47

76 Fed. Reg. 52,738 ................................................................ 43

77 Fed. Reg. 58368 ............................................................ 18, 50

78 Fed. Reg. 23552, FERC Docket CP13-113 (Apr. 19, 2013) .......... 18, 50

78 Fed. Reg. 34089, FERC Docket CP13-483 (June 6, 2013) .......... 19, 50

78 Fed. Reg. 38703.................................................................... 19, 50

78 Fed. Reg. 62344.................................................................... 19, 50

DOE, *Life Cycle Greenhouse Gas Perspective on Exporting Liquefied Natural Gas From the United States,* 79 Fed. Reg. 32,260 (June 4, 2014)..................................................... 39

79 Fed. Reg. 48,132 (Aug. 15, 2014) ......................................... 8

79 Fed. Reg. 3197...................................................................... 18, 50

## Agency Orders

Department of Energy Delegation Order No. 00-004.00A (May 16, 2006) ............................................................ 1, 4

DOE Redelegation Order No. 00-002.04E (Apr. 29, 2011)...................... 4

DOE Order 3282 (May 20, 2013) .............................................. 16

DOE Order 3357 (Nov. 15, 2013).................................... *passim*

148 FERC 61,076 ¶6 (July 30, 2014) ..................................... 9, 10

## Legislative History

Statement of Christopher Smith, Deputy Assistant Secretary, Department of Energy, before the Senate Committee on Energy and Natural Resources (Nov. 8, 2011)................................................................... 3

## Other Authority

Deloitte Marketpoint, *Analysis of Economic Impact of LNG Exports from the United States*, at 7, 25............................ 42

Galveston Baykeeper, *About Galveston Baykeeper*, http://galvestonbaykeeper.org/home/about-galveston-barkeeper (last visited March 5, 2015)............................ 25

Sierra Club, *From the Current Articles of Incorporation &*
    *Bylaws* (July 13, 2006),
    http://www.sierraclub.org/sites/www.sierraclub.org/files/g
    oals.pdf;................................................................................. 25

Sierra Club, Comments on Draft Environment Impact
    Statement for Freeport LNG Liquefaction Project, No.
    CP12-509 (May 5, 2014)............................................................ 3

# **GLOSSARY**

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

FERC        Federal Energy Regulatory Commission

EIS         Environmental Impact Statement

NEPA        National Environmental Policy Act

LNG         Liquefied Natural Gas

bcf/d       billion cubic feet per day

## __INTRODUCTION__

Sierra Club and Galveston Baykeeper ask this Court to require additional environmental review for the Freeport Liquefied Natural Gas export project ("Project" or "Freeport Project").  The Freeport Project is among the first of more than thirty proposals seeking authorization to export natural gas from the United States by constructing liquefied natural gas export facilities.[1] These projects have been proposed in recent years because development of shale gas in the United States has significantly increased domestic gas supply and significantly reduced domestic gas prices.[2]

Connecting the United States' supply of natural gas to global gas demand is likely to increase the amount of domestic gas drilling and production. This additional gas production, as well as other consequences of liquefied natural gas, will have significant

---

[1] Department of Energy, *Applications Received by DOE/FE to Export Domestically Produced LNG from the Lower-48 States (as of March 24, 2014)*, (annexed as Exhibit 56 to Sierra Club, Comments on Draft Environment Impact Statement for Freeport LNG Liquefaction Project, No. CP12-509 (May 5, 2014) ("Sierra Club EIS Comment")).

[2] Statement of Christopher Smith, Deputy Assistant Secretary, Department of Energy, before the Senate Committee on Energy and Natural Resources (Nov. 8, 2011) (annexed as Exhibit 2 to Sierra Club, Motion to Intervene (Oct. 3, 2012) ("Sierra Club Intervention")).

environmental impacts. Yet, FERC explicitly refused to evaluate and disclose these environmental impacts in its NEPA review of the Project. NEPA requires acknowledgment and analysis of these impacts, both as indirect impacts of the Project, and as cumulative impacts of the Project together with other liquefied natural gas export proposals. For these reasons, and for the additional reasons described below, Petitioners respectfully request that the Court remand this proceeding to FERC for further environmental analysis in compliance with NEPA.

## LEGAL BACKGROUND

## I.    The Natural Gas Act

Imports and exports of natural gas, and their related infrastructure, are regulated under the Natural Gas Act, 15 U.S.C. § 717b (2012). More specifically, the Department of Energy has statutory authority under the Act, DOE Redelegation Order No. 00-002.04E (Apr. 29, 2011) (assuming responsibilities of former Federal Power Commission).  Although the Department of Energy retains authority over the import and export of natural gas, the Department has delegated authority over the siting, construction, and operation of

liquefied natural gas export facilities to FERC. DOE Order No. 00-004.00A at 1.21(a) (May 16, 2006).

In reviewing export projects, both the Department of Energy and FERC must determine whether the project is "consistent with the public interest." 15 U.S.C. § 717b(a) (2012). While the public interest inquiry is rooted in "assur[ing] the public a reliable supply of gas at reasonable prices," *United Gas Pipe Line Co. v. McCombs*, 442 U.S. 529, 536 (1979), the Natural Gas Act also grants the agencies "authority to consider conservation, environmental, and antitrust questions." *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 666 n.4 (1976) (citing 15 U.S.C. § 717b as an example of a public interest provision); *id*. at 670 n.6 (explaining that the "public interest" referred to in § 717b includes environmental considerations). Although the Department of Energy must automatically approve exports to nations "with which there is in effect a free trade agreement requiring national treatment for trade in natural gas," for exports to all other nations, the Department of Energy must first determine whether the proposed project to export liquefied natural gas is in the public interest. 15 U.S.C. § 717b(a), (c).

## II.   National Environmental Policy Act

The National Environmental Policy Act of 1969 (NEPA)

established that it would be:

> [T]he continuing policy of the Federal Government . . . to use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

42 U.S.C. § 4331(a) (2012).  NEPA has two primary aims: to force

agencies to "consider every significant aspect of the environmental

impact of a proposed action" and to ensure that the federal agency will

"inform the public that it has indeed considered environmental concerns

in its decision-making process."  *Balt. Gas & Elec. Co. v. Natural Res.

Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (internal quotations omitted).

To accomplish these twin aims, agencies must prepare an

Environmental Impact Statement ("EIS") for "major Federal actions

significantly affecting the quality of the human environment." 42 U.S.C.

§ 4332(c) (2012).

As part of the required environmental analyses, agencies must

take a hard look at the direct impacts of the action as well as the

"reasonably foreseeable" indirect and cumulative impacts. 40 C.F.R. §§

1502.14, 1508.8.  Indirect effects are those effects "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.8(b).  Indirect effects include "growth inducing effects," *id*., and effects outside the scope of the agency's regulatory authority.  *See Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 29-30 (D.C. Cir. 2008); *TOMAC v. Norton*, 240 F. Supp. 2d 45, 50-52 (D.D.C. 2003) *aff'd sub nom. TOMAC - Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 851-52 (D.C. Cir. 2006) (holding an EIS inadequate for failing to consider effects of project-induced economic growth on air quality, groundwater, and floodplains); *see also Sierra Club v. Marsh*, 769 F.2d 868, 877 (1st Cir. 1985), *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'r*, 109 F. Supp. 2d. 30, 32-33 (D.D.C. 2000) (requiring the agency to evaluate all reasonably foreseeable effects, including upland and growth-inducing effects from three floating casinos, and the cumulative effects of the three casinos in connection with the twenty other permitted floating casinos along the Mississippi coast).

An effect is "reasonably foreseeable" if "it is sufficiently likely to occur that a person of ordinary prudence would take it into account in

reaching a decision." *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549 (8th Cir. 2003) (quoting *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992)).  Agencies must engage in "[r]easonable forecasting and speculation," *Scientists' Inst. for Pub. Info. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973), and have an affirmative obligation to procure information regarding reasonably foreseeable impacts when possible.  40 C.F.R. § 1502.22. When an agency fails to follow any of these requirements, the agency deprives decision makers and the public of valuable information necessary for a full understanding of the magnitude and significance of a project's impacts.

## III.  FERC and Department of Energy Coordination of Natural Gas Act and NEPA Review

At the times pertinent to this appeal, the Department of Energy and FERC used a coordinated and staggered framework for their Natural Gas Act and NEPA reviews of proposed projects for export of natural gas to non-free trade agreement countries. Dep't of Energy, *Import and Export of Natural Gas; New Administrative Procedures;*

*Proposed Rule*, 46 Fed. Reg. 44696, 44700 (Sept. 4, 1981).[3] Under that framework, the Department of Energy first examined whether, putting environmental impacts aside, the proposed exports were consistent with the public interest. *See, e.g.*, 77 Fed. Reg. 47446 (Aug. 13, 2014). If so, the Department of Energy would grant conditional approval. *Id.* FERC would then act as the lead agency for NEPA review, with the Department of Energy acting as a cooperating agency.[4] *Id.* After FERC completed its NEPA review and made its Natural Gas Act public interest determination regarding the Project the Department of Energy would then make its own NEPA determination and revisit the substance of the public interest determination.

## FACTUAL BACKGROUND

### I.    Freeport LNG Import Project

_____

[3] After the Department of Energy conditional authorizations and the FERC authorization were issued for this Project, the Department of Energy announced a change in this framework. 79 Fed. Reg. 48,132 (Aug. 15, 2014).  Pursuant to this change, the Department of Energy no longer issues conditional authorizations prior to completion of NEPA review.

[4] 40 C.F.R. § 1506.3(c) allows a cooperating agency to adopt a lead agency's EIS without recirculating provided that the cooperating agency reviews the EIS and "concludes that the comments and suggestions have been satisfied."

In 2004, FERC authorized the Freeport LNG to site, construct, and operate a liquefied natural gas import terminal on Quintana Island, Texas.  148 FERC 61076 ¶16 (July 30, 2014), 20140730-3060 ("Authorization Order")[5] (summarizing the Project's history).  The 2004 Order authorized "Phase I," a project with a capacity to import 1.5 billion cubic feet per day (bcf/d) of natural gas. *Id.*  The facilities authorized by that order were completed, and authorized for entry in to service, on July 1, 2008. *Id.* While construction of these facilities was underway, Freeport LNG received authorization to construct a "Phase II" expansion of that project, which would increase the import capacity to 4.0 billion cubic feet per day. *Id.*  The authorized Phase II expansion was never constructed. *Id.*

## II.    The Shale Gas Boom

Completion of the Phase I import project coincided with a sea change in U.S. gas production. Driven primarily by advancements related to hydraulic fracturing ("fracking") of natural gas from shale, 20121003-5166 (Exhibit 2) at 5, 20120831-5217 (RR13-LIQ at 13-12,

---

[5] Documents cited are found in FERC docket number CP12-509 unless otherwise indicated.

8

RR13-PTF at 13-3), from 2007 through 2013 domestic natural gas production steadily and significantly increased. 20121003-5166 (Exhibit 82), 20140505-5230 (Exhibit 57). In addition to increasing domestic gas supply, development of shale gas led to significant reductions in domestic gas prices.  20121003-5166 (Exhibit 2) at 5.

Natural gas production causes significant environmental impacts, including the emission of ozone-forming pollutants, such as volatile organic chemicals and nitrogen oxides.  Fed. Reg. 52738, 20120831-5217 (annexed as Exhibit 28).  In many areas where production has increased in the last decade, natural gas development has been identified as a primary cause of unhealthy ozone levels.  76 Fed. Reg. 52,738, 20120831-5217 (annexed as Exhibit 28, 52,751), 20120831-5217 (annexed as Exhibit 36, viii) (describing natural gas production's contribution to Wyoming ozone levels).  Natural gas production is also a major source of greenhouse gases, principally methane.  In 2011, natural gas production, transmission, and processing were the largest sources of methane emissions in the United States.  20140505-5230 (Exhibit 30 at ES-13).

## III.  The Energy Information Administration's Liquefied Natural Gas Export Study

By 2011, the gas boom had significantly transformed the domestic gas market. With cheap, abundant domestic gas, the Freeport LNG Import Terminal, like the overwhelming majority of domestic liquefied natural gas import capacity, sat almost completely idle. 20140505-5230 (Exhibit 2 at 5) (between 2008 and 2012, Freeport LNG Import Terminal received an annual average of three import shipments, out of a planned annual capacity of 200), 20121003-5166 (Exhibit 80 at 4) (in 2011, only five percent of U.S. liquefied natural gas import capacity was used).

In light of this transformation, Freeport LNG, like many other import facilities, proposed to convert its liquefied natural gas import facility to a liquefied natural gas export facility. DOE Order 3357 at 1 (describing Freeport's December 2010 and December 2011 export applications).  In August of 2011, after receiving applications for four export projects (including one by Freeport), the Department of Energy commissioned the Energy Information Administration to study the potential impact of liquefied natural gas exports on energy

10

consumption, production, and pricing.  20140505-5230 (Exhibit 2 at 8-9), 20140505-5230 (Exhibit 21 at Appendix A).

The Energy Information Administration responded by publishing "Effect of Increased Natural Gas Energy Exports on Domestic Energy Markets" in January 2012.  20140505-5230 (Exhibit 21) (hereinafter the "Export Study").  That study predicted the effects resulting from two export scenarios: the export of six and twelve billion cubic feet per day of export-driven gas demand.[6]  *Id.* at 1.  Each of those export scenarios was evaluated against four different possible background cases. *Id.* These forecasts were developed using the Energy Information Administration's principal modeling tool, the National Energy Modeling System. *Id.* at 2.

Relevant to this case, the Energy Information Administration Export Study concluded that:

> Increased natural gas exports lead to increased gas prices. . . .

_____

[6] The Export Study considers the total demand created by exports, rather than the volume of exports themselves. Because liquefying natural gas requires, according to Energy Information Agency, energy equivalent to ten percent of the gas exported, the actual volumes of export contemplated by the study are ten percent lower than six and twelve billion cubic feet per day.  Export Study at 2.

> Natural gas markets in the United States balance in response to increased natural gas exports largely through increased natural gas production . . . .
>
> The remaining portion is supplied by natural gas that would have been consumed domestically if not for the higher prices. The electric power sector accounts for the majority of the decrease in delivered natural gas. Due to higher prices, the electric power sector primarily shifts to coal-fired generation.

Export Study at 6 (emphases and bullet points omitted). Specifically, the average of the Export Study's reference predictions forecasted that domestic natural gas production would increase by sixty-three percent. Export Study at 10. Natural gas consumption would decrease by 37 percent. *Id.* Of the 37 percent decrease in gas consumption, the Export Study predicted that the majority (72 percent) would be constituted by consumers shifting from gas to coal. *Id.* at 18. Thus, for a given volume of exports, 27 percent of the exported gas would, on a market-wide level, come from consumers who shift from gas to coal. Consumers switching from gas to other energy sources, or reducing their overall energy consumption, account for the remaining 10 percent of the volume of exports. *Id.*

    The Export Study also concluded that increases in domestic coal use caused by liquefied natural gas exports would result in increased

domestic carbon dioxide emissions. *Id.* at 18-19. Specifically, the Export Study concluded that in reference cases, exporting six billion cubic feet per day of natural gas would increase carbon dioxide emissions from domestic fossil fuel combustion by at least 32 million metric tons per year; and exporting 12 billion cubic feet per day would increase carbon dioxide emissions by at least 49 million metric tons per year. *Id.* at 19. Those estimates only encompass combustion emissions, and do not include emissions from additional natural gas or coal production.

## IV.    The Freeport LNG Export Project

In December 2011 and August 2012, Freeport submitted a pair of applications to FERC that, together, sought authorization to modify the existing Freeport LNG facility to enable the export of 1.8 billion cubic feet of liquid natural gas per day. Authorization Order ¶¶ 1, 2, 17. That amount is equivalent to three percent of the Energy Information Institute's estimated gas demand that would be consumed in the U.S. in the absence of liquefied natural gas exports. Export Study, Table B5.[7]

---

[7] Energy Information Administration's baseline for delivered volumes is 23.67 trillion cubic feet per year, or 64.9 bcf/d.

To enable these new liquefied natural gas exports, Freeport LNG submitted two applications to FERC. The first application sought to modify the previously authorized, but never constructed, "Phase II" import facilities to allow export and import of stored liquefied natural gas. Authorization Order  ¶1 (summarizing FERC docket CP12-29). The second application sought authorization to construct facilities to liquefy natural gas delivered by pipeline to produce liquid natural gas. *Id.*¶ 2 (summarizing FERC docket CP12-509).  These Projects include pretreatment facilities to remove impurities from pipeline gas and three liquefaction units, called "trains," to chill gas until it condenses into a liquid. *Id.* ¶¶ 17, 21.  These facilities require significant additional supporting infrastructure, including nearly 20 miles of new pipeline, *id.* ¶ 22, an 87-megawatt equivalent natural gas fired turbine, 20140505-5230 (Exhibit 15 at 10), and use of up to 720 megawatts of electric power taken from the electricity grid, 20140616-4003 at 1-13.  The proposed exports would also require 250 tanker ship calls per year. Authorization Order ¶ 61.

In May and November 2013, while Freeport LNG's applications were pending at FERC, the Department of Energy authorized liquefied

14

natural gas exports from the Project to non-free trade agreement

countries, conditioned on further review after FERC's completion of the

NEPA process.  DOE Order 3282 (May 20, 2013), Dep't of Energy Order

3357 (Nov. 15, 2013).[8]  In those conditional authorizations, the

Department of Energy accepted the Export Study as "fundamentally

sound," *id.* at 153, and relied on the Export Study's specific predictions

regarding natural gas price increases to determine that the Project's

impact on price would not be so great as to be inconsistent with the

public interest.  *Id.* at 151.  The Department of Energy's conditional

authorizations explicitly omit discussion and consideration of

environmental impacts. *Id.* at 19.  Instead, the Department of Energy

committed to revisiting the authorizations after the completion of

FERC's NEPA review. *Id.*

FERC released its draft environmental impact statement for the

Project in March 2014, followed by an EIS in June 2014. The EIS

---

[8] Both of these Department of Energy Conditional Authorizations were cited and discussed by Sierra Club's comment on the draft EIS, DEIS Comment at 24, and by FERC's Authorization Order, P.17 n.6. As such, these orders are part of the record here. *Pac. Shores Subdivision Cal. Water District v. Army Corps of Engineers*, 448 F. Supp. 2d 1, 6–7 (D.D.C. 2006).

addressed the direct, local impacts of the Project, but contained only

limited discussion of indirect impacts occurring outside Brazoria

County. For example, in discussing climate impacts, the EIS explained

that the Project would emit 1,620,443 tons per year of carbon-dioxide

equivalent.  EIS at 4-211, 4-218.  The EIS also concluded that the

production of electricity consumed by the Project would create indirect

air pollution impacts.  *Id.* at Appendix F.  The EIS did not, however,

quantify the total amount of pollution that would be emitted.  And,

although the EIS states that the purpose of the Project is to "allow for

exportation of domestic natural gas to the global market," *id.* at 1-3, the

EIS did not consider the effects of connecting foreign gas demand with

domestic gas supply.  Instead, the EIS concludes that effects associated

with additional gas production (effects "upstream" of the export

terminal) and with foreign buyers' combustion and use of exported gas

(effects "downstream" of the export terminal) were not reasonably

foreseeable.  *Id.* at 4-241.

The EIS also did not address the effects of the increase in

domestic coal use that would result from liquefied natural gas exports,

*id.* at L-216, nor the cumulative effects of other liquefied natural gas

16

export projects. By the time the draft EIS was prepared for this Project, FERC had recently authorized,[9] prepared a draft EIS for,[10] or issued a notice of application and solicitation of intervention for[11] other projects amounting to 10.7 billion cubic feet per day of exports.

FERC authorized the Project on July 30, 2014. Authorization Order. Sierra Club timely sought rehearing on August 29. Rehearing Request. On November 13, FERC denied Sierra Club's rehearing request on the merits. Rehearing Order. Sierra Club timely appealed.

## SUMMARY OF ARGUMENT

---

[9] *Sabine Pass Liquefaction, LLC and Sabine Pass LNG, L.P.,* 139 FERC ¶ 61,039 (2012) and *Sabine Pass Liquefaction, LLC and Sabine Pass LNG, L.P.,* 146 FERC ¶ 61,117 (Feb. 20, 2012) (together, authorizing 2.76 bcf/d).

[10] Cameron LNG, LLC and Cameron Interstate, LLC, 79 Fed. Reg. 3197, FERC Dockets CP13-25 and CP13-27 (Jan. 17, 2014) (1.7 bcf/d)

[11] Corpus Christi Liquefaction, 77 Fed. Reg. 58,368, FERC Dockets CP12-507, CP12-508 (Sept. 20, 2012) (2.1 bcf/d), Dominion Cove Point LNG, 78 Fed. Reg. 23,552, FERC Docket CP13-113 (Apr. 19, 2013) (0.77 bcf/d), Jordan Cove Energy Project, 78 Fed. Reg. 34,089, FERC Docket CP13-483 (June 6, 2013) (0.8 bcf/d), LNG Development Company (d/b/a Oregon LNG), 78 Fed. Reg. 38,703, FERC Dockets CP09-6 and CP09-7 (June 27, 2013) (1.25 bcf/d), Sabine Pass Liquefaction Expansion, 78 Fed. Reg. 62,344, FERC Dockets CP13-552 and CP13-553 (Oct. 18, 2013) (1.38 bcf/d).

Under NEPA, this Court must conduct a thorough review to ascertain whether FERC took the required hard look at the Project's impacts.      FERC failed to take the required hard look at the Project's indirect and cumulative impacts.  Additionally, the EIS misrepresents the Project's air impacts by failing to quantify the air pollution that would be caused by the Project's substantial electricity needs.

FERC violated NEPA by failing to analyze the environmental impacts of two indirect and foreseeable market-mediated effects of the Project.

These impacts were not only foreseeable, but were also foreseen by the Export Study. An increase in domestic gas production and an increase in domestic coal use was predicted by the Energy Information Administration in the Export Study. Combined, these effects amount to more than 12 million metric tons per year of carbon dioxide equivalent greenhouse gas emissions, far more than the 1.5 million metric tons of emissions enumerated in the EIS, and similarly large increases in emissions of ozone-forming pollutants.

FERC further violated NEPA by failing to consider the Project in the context of other proposed liquefied natural gas export projects and

18

the cumulative impact of these proposals. At the time FERC prepared the EIS for the Project, FERC review was underway of projects for six other terminals, amounting to an additional 10.7 billion cubic feet per day of export capacity. FERC's refusal to consider the cumulative effects of the increases in gas production and coal use that would result from these proposals violated NEPA.

Finally, FERC violated NEPA by failing to present the information regarding the air pollutant emissions related to the generation of electricity required by the project in a clear manner. The EIS, containing the electricity related emissions in pounds per megawatt hour, dramatically understated the yearly emissions totals the Project would create. Thus, the EIS is misleading

## STANDARD OF REVIEW

FERC's compliance with NEPA is reviewed under the Natural Gas Act's judicial review provision, 15 U.S.C. § 717r(b), using the familiar arbitrary and capricious standard.  FERC's decision "will be set aside as arbitrary and capricious if it is not the product of reasoned decisionmaking," *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (internal quotations omitted).  The court must

determine whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choices made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).  "[A]gency action . . . can be upheld only on the basis of a contemporaneous justification by the agency itself, not *post hoc* explanation of counsel," *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 860 (D.C. Cir. 2012).

## ARGUMENT

### I.  FERC Violated NEPA by Failing to Consider Foreseeable Indirect Impacts from the Project.

#### A.  The Project Will Cause Foreseeable Changes in the Domestic Natural Gas Market and Associated Emissions Impacts.

Basic economic principles teach that connecting the United States' isolated natural gas market with overseas gas demand will have several effects.  Increased demand for U.S. gas will drive up prices in the domestic market.  Higher domestic prices will, in turn, cause both an increase in domestic gas production and a shift by some domestic gas users to other fuels.  The fact that price increases will impact the

20

demand side of the market is "self-evident," and courts assume these market principles apply absent evidence of an applicable exception. *Airlines for America v. Transp. Security Admin.*, ___ F.3d ___, ___, Docket 14-1143, Slip. Op. 3-4 (D.C. Cir. Mar. 10, 2015) (quoting *Sierra Club v. EPA*, 292 F. 3d 895, 900 (D.C. Cir. 2002)).

Freeport LNG invoked these very principles in its applications to FERC and the Department of Energy, arguing that by connecting U.S. gas supplies with foreign gas demand,(1) the Project "will indirectly create approximately 20,000 to 25,000 new American jobs associated with *increased* natural gas exploration and production," 20120831-5217 at 2 (emphasis added), (2) the gas exported will primarily come from "incremental" production, and (3) most, if not all, "of the gas required" by the Project "may never otherwise be produced." 20140829-5227 at 5 n.2 (quoting Application of Freeport LNG Expansion, L.P. and FLNG Liquefaction, LLC for Long-Term Authorization to Export Liquefied Natural Gas to Non-Free Trade Agreement Countries, DOE/FE Docket 11-161-LNG, at 25, 28 (Dec. 19, 2011)).

In *Mid States Coal. for Progress v. Surface Transp. Bd.*, the Eighth Circuit explained how the basic principles of supply and demand

21

apply to energy markets in the NEPA context.  In reviewing a project

that would provide a cheaper supply of coal, the court explained:

> The increased availability of inexpensive coal will at
> the very least make coal a more attractive option to
> future entrants into the utilities market when
> compared with other potential fuel sources, such as
> nuclear power, solar power, or natural gas.  Even if
> this project will not affect the short-term demand for
> coal, which is possible since most existing utilities are
> single-source dependent, it will most assuredly affect
> the nation's long-term demand for coal . . . .

345 F.3d at 548-49.  The court rejected, as "illogical at best," the

agency's argument that "the demand for coal will be unaffected by an

increase in availability and a decrease in price, which is the stated goal

of the project."  *Id.* at 549.  Because an increase in coal demand and

combustion was foreseeable, the effect of this combustion was an

indirect effect that the agency was required to address in the EIS.  *Id.*

at 550.  The court thus remanded the matter to the agency to analyze

the indirect effects of this increased coal demand.  *Id.* at 550, 556.

Here, these basic market principles indicate that the Project will

increase domestic gas production and increase domestic coal use, both of

which will, in turn, increase domestic greenhouse gas and ozone

emissions, as Sierra Club explained in its comment on the draft EIS.

22

20140505-5230 at 23-26, 50-51.  These same principles indicate that the Project will increase gas use in foreign markets, which may increase foreign greenhouse gas emissions, especially if imported gas displaces renewable or other non-fossil fuel energy.  *Id.* at 52-53.  Because the nature of these impacts is reasonably foreseeable, FERC was required to evaluate them, even if their extent is uncertain.  *Mid State Coal. for Progress*, 345 F.3d at 549.

In this case, moreover, both the nature *and* the extent of increases in gas production and coal use can be, and have been, reasonably foreseen.  The Export Study specifically predicted the extent to which LNG exports from the Gulf Coast would increase gas production and coal use.  20140505-5230 at 23-26, 50-51.  The Department of Energy accepted the Export Study as "fundamentally sound" and reliable enough to be used in assessing the Project's economic impacts, concluding that "more natural gas is likely to be produced domestically if LNG exports are authorized than if they are prohibited."  DOE Order 3357 at 153, 107.  FERC does not provide any basis for questioning the Export Study, its predictions, or the Department of Energy's use thereof or for suggesting that the Freeport Project will not conform to the

23

pattern predicted by the Export Study.  Because the Export Study is reliable enough to forecast economic impacts, it is reliable enough to inform environmental analysis.  *Scientists' Inst. for Pub. Info.*, 481 F.2d at 1097.  If FERC was unwilling, for some reason, to rely on the conclusions of the Export Study, it could, in any event, have borrowed the study's tools or methodology to do its own forecasting analysis.  40 C.F.R. § 1502.22.

### B.    Project-Induced Increases in Domestic Gas Production Will Have Foreseeable Adverse Effects on Greenhouse Gas Emissions and Ozone Levels.

FERC was required, but failed, to evaluate these project-induced indirect emissions impacts.  Stimulation of additional production is touted by the applicant as a benefit, if not the purpose, of the Project. 20120831-5217 at 2, EIS at 1-3.  Where "growth-inducing effects of [a] project are its raison d'etre," these effects are reasonably foreseeable and must be considered in EIS.  *City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975).

As Sierra Club's comments on the draft EIS illustrate, FERC could have estimated the amount of air pollution that would be emitted by additional gas production.  Comment on EIS at 39-40. First, with

respect to methane emissions,[12] EPA has estimated that in the course of natural gas production, an average of 1.5 percent of the methane produced escapes into the atmosphere.[13]  Comment on EIS at 30; EPA, Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990 – 2011 (annexed as Exhibit 30 to Comment on EIS).  The Export Study predicts that gas production will increase by 63 percent of the volume of gas exported.  Accordingly, it is reasonably foreseeable, based on established EPA and Department of Energy methodologies and predictions, that the Project will result in an additional 117,000 metric tons per year of methane emissions.[14]

---

[12] Natural gas is primarily methane, a potent greenhouse gas.  EPA, Technical Support Document: Oil and Natural Gas Sector: Standards of Performance for Crude Oil and Natural Gas Production, Transmission, and Distribution, at 2-2 (July 2011) (annexed as Exhibit 25 to Protest).

[13] Sierra Club contends that available evidence indicates that the likely leak rate is significantly higher. EPA's estimate, however, provides a likely lower bound.

[14] One billion cubic feet of methane weighs 18,900 metric tons.  EPA, Technical Support Document: Oil and Natural Gas Sector: Standards of  Performance for Crude Oil and Natural Gas Production, Transmission,  and Distribution, at Table 4-2 (July 2011) (annexed as Exhibit 25 to  Protest).  Given that the Project will export 1.8 billion cubic feet per day, or 657 billion cubic feet per year (1.8 bcf/day x 365 days/year), it is possible to calculate the amount of methane emitted

The primary greenhouse gas emitted by gas production is methane.  76 Fed. Reg. 52,738  Methane is "sufficiently long-lived" that its contributions to climate change do not depend on the geographic location of its emissions.  EPA, *Endangerment and Cause or Contribute Findings for Greenhouse Gases under Section 202(a) of the Clean Air Act*; Final Rule, 74 Fed. Reg. 66497, 66499 (Dec. 15, 2009).  Thus, even if the location and timing of induced natural gas production is speculative, FERC can and must evaluate the Project's contribution to domestic greenhouse gas emissions from induced natural gas production.  Its failure to do so was arbitrary and capricious.

Likewise, FERC could have provided reasonable estimates for project-induced emissions of other air pollutants.  EPA estimates that for every 100 tons of methane emitted from gas well completions, 14.59 tons of volatile organic chemicals and 1.06 tons of hazardous air pollutants are emitted.  EPA, Technical Support Document: Oil and

---

from natural gas as a result of the Project based on the percent of natural gas induced (63 percent of exports) and natural gas leakage rate (1.5% of methane produced leaks).  In sum: 18,900 metric tons per billion cubic feet x 657 billion cubic feet per year x 0.63 x 0.015 = approximately 117,000 metric tons per year.

Natural Gas Sector: Standards of Performance for Crude Oil and Natural Gas Production, Transmission, and Distribution, at Table 4-2 (July 2011) (annexed as Exhibit 25 to Protest).  Accordingly, the Project will cause 17,100 metric tons of volatile organic chemicals and 1,240 metric tons of hazardous air pollutant emissions per year.[15]

The emissions of these air pollutants will have foreseeable adverse effects on regional ozone levels.  Air pollution from gas production is widely recognized as a major contributor to regional ozone formation. *See, e.g.*, 20121003-5166 (Ex. 36 at viii) (finding that Wyoming ozone pollution was "primarily due to local emissions from oil and gas . . . development activities: drilling, production, storage, transport, and treating.").  Ozone results from emissions of nitrogen oxides and volatile organic chemicals from sources "across a broad geographic area." EPA,

_____

[15]  Additionally, a similar Department of Energy study, which found higher estimates of upstream methane leakage from natural gas production using a more sophisticated mode of analysis.  *See, e.g.*, DOE, Life Cycle Greenhouse Gas Perspective on Exporting Liquefied Natural Gas From the United States, 79 Fed. Reg. 32,260 (June 4, 2014). The Department of Energy filed these reports in its dockets for the Freeport Project, *id.*, and both Sierra Club and EPA asked that these reports "be considered as part of the decision making for this project."  EPA, Comment on Final EIS for Freeport LNG Liquefaction Project, 2 (July 28, 2014); Rehearing Request at 5-6.  Nonetheless, FERC declined to address these reports.

*Finding of Significant Contribution and Rulemaking for Certain States in the Ozone Transport Assessment Group Region for Purposes of Reducing Regional Transport of Ozone*, 62 Fed. Reg. 60,318, 60,326 (Nov. 7, 1997).  As such, it is reasonable to consider ozone emissions across a wide area in determining impacts on regional ozone levels. *See, e.g.*, *Sierra Club v. E.P.A.*, 774 F.3d 383, 385, 397-99 (7th Cir. 2014) (holding it is reasonable to consider reductions in ozone precursor emissions across a twenty-two state region in assessing ozone levels in Milwaukee–Racine, Chicago, and St. Louis).

As Sierra Club explained in comments on the draft EIS, the Energy Information Administration's tools can identify the regions where additional gas production will occur. Comment on draft EIS at 24-25, 34-36.  The Energy Information Administration's National Energy Modeling System, which the agency used to develop the Export Study, divides the continental forty eight states into six regions for purposes of natural gas supply.  Energy Information Administration, National Energy Modeling System: An Overview 2009, 12 (Oct. 2009) (annexed as Exhibit 26 to Comment on DEIS). Gas production regions

28

near the Project include the Gulf Coast,[16] the Midcontinent,[17] and the

Southwest.[18]  Energy Information Administration, Model

Documentation: Natural Gas Transmission and Distribution Module of

the National Energy Modeling System, 1-2 (Feb. 2012) (annexed as

Exhibit 27 to Comment on DEIS).[19]  Deloitte Marketpoint, a private

consultant, indicates that its World Gas Model is capable of even more

fine-grained predictions, modeling individual gas plays.  Deloitte

Marketpoint, *Analysis of Economic Impact of LNG Exports from the*

*United States*, at 7, 25 (annexed as Exhibit 25 to Comment on DEIS).

    In dismissing Sierra Club's comments and concerns, FERC did not

address the fact that the model underlying the Export Study, as well as

other available models, could provide such predictions.  40 C.F.R. §

---

[16] Including Florida, Alabama, Mississippi, Louisiana, and southeast Texas.

[17] Including Arkansas through Minnesota, as well as Oklahoma, Kansas, Nebraska, and north Texas.

[18] Including central and west Texas and eastern New Mexico.

[19] Supplemental materials to EIA's 2012 study actually broke out how much of the production increase would occur in each of these regions. EIA, Lower 48 Natural Gas Production and Wellhead Prices by Supply Region, available at http://www.eia.gov/oiaf/aeo/tablebrowser/#release=FE2011&subject=16-FE2011&table=72-FE2011&region=0-0&cases=rfhexslw-d090911a,rflexrpd-d090911a,rflexslw-d090911a,rfhexrpd-d090911a,ref2011fe-d020911a.

1502.22(a) (requiring agencies to obtain information relevant to reasonably foreseeable impacts when cost is not prohibitive).  Further, FERC failed to address Freeport LNG's more specific prediction that "much of the . . . gas that would meet demand created by the Export Authorization will be incremental production within Texas, largely from the South Texas (Eagle Ford) shale."  DOE/FE Dkt. No. 11-161-LNG App., at 25.[20]  Thus, FERC had the ability to study the Project's impact on ozone levels, and its failure to do so was arbitrary and capricious.

### C.   The Project's Exportation of Natural Gas Will Foreseeably Increase Coal Consumption, Causing Additional Ozone and Climate Impacts.

FERC also could and should have evaluated the greenhouse gas emissions and ozone impacts associated with the predicted shift by some domestic consumers from gas to coal in response to increasing gas prices.  Here again, the Export Study provides one possible methodology, but not the only one, for estimating these impacts.  The

---

[20] FERC characterized the Application to the Department of Energy as stating where gas processed by the project would come from, but FERC mistakenly contended that Applicants had not predicted where production *induced by* the Project would refer. Rehearing Order PP.18-19.  The Application's reference to "incremental" production necessarily refers to production induced by the project.

study explains that 63 percent of natural gas lost to exports will be

replaced with increased domestic production, Export Study at 10,

meaning that 37 percent must be replaced by other sources (coal,

renewables, energy conservation, etc.).  The Export Study predicts that

72  percent of that remaining 37 percent will be replaced by coal.  *Id.* at

18.  Thus, the study estimates there will be a 27 percent increase (37%

x 72% = 27%) in coal consumption as a result of price-driven

substitution.  Applying this methodology to Freeport's proposed export

of 1.8 billion cubic feet per day of gas exports and using standard

combustion emissions equation, FERC could have readily estimated the

additional carbon dioxide emissions from the Project.  Emissions of the

ozone precursors nitrogen oxides and volatile organic chemicals could

have been addressed similarly.  For example, EPA's eGRID tool, which

FERC relied on in the EIS, provides nitrogen oxide emission rates for

different power plant types.  EIS at 4-223.

FERC refused to consider the effects of coal use on the grounds

that NEPA obligations does not require the EIS to look beyond the

agency's jurisdiction.  This position is manifestly incorrect.  NEPA

requires agencies to consider indirect effects, including growth-inducing

effects, that the agencies do not directly regulate. *See Mich. Gambling Opposition*, 525 F.3d at 29-30. The Ninth Circuit illustrated this point in holding that the Army Corps of Engineers, in reviewing dredge and fill permit applications, must consider environmental effects beyond those caused by the dredge and fill itself. *Save Our Sonoran v. Flowers*, 408 F.3d 1113, 1118 (9th Cir. 2005). "[W]hile it is the development's impact on jurisdictional waters that determines the scope of the Corps' permitting authority, it is the impact of the permit on the environment at large that determines the Corps' NEPA responsibility." *Id.* at 1122. Thus, the fact that FERC does not have jurisdiction "over the export of natural gas as a commodity," Rehearing Order P.52, does not limit the scope of FERC's NEPA obligation to consider the impacts of the additional coal use that follows directly from exporting natural gas.

Insofar as the scope of the Department of Energy's delegation of authority to FERC is relevant, the Department's statements affirm that the Department intended FERC to consider these the full scope of the Project's foreseeable impacts. Contrary to FERC's assertion that "there [is not] any indication that the [Secretary of Energy's] delegation authorized the Commission to consider" issues relating to coal use,

Authorization Order at P.32, the Department of Energy explicitly

instructed FERC to act as lead agency for NEPA review.  DOE, *Import*

*and Export of Natural Gas; New Administrative Procedures; Proposed*

*Rule*, 46 Fed. Reg. 44696 (Sept. 4, 1981); DOE Order 3357 at 19. The

Conditional Authorizations indicate that the Department of Energy

expected FERC to consider the entire range of impacts associated with

the Project, rather than limit the scope of review to the extent of

FERC's permitting authority.  DOE Order 3357 at 132, 163-64.

Thus, for purposes of NEPA review, air pollution caused by increased

coal use is an effect of FERC's authorization of the Project, regardless of

the fact that the Department of Energy has, and FERC lacks,

jurisdiction over the export of gas.  FERC's failure to analyze the

impacts of this additional pollution in the EIS was arbitrary and

capricious and in violation of NEPA.

## II.    FERC Failed to Consider the Cumulative Impacts that the Freeport Project Will Cause Together with Other Foreseeable Export Projects.

NEPA requires that agencies consider the cumulative effects

resulting from the "incremental impact of the action when added to

other past, present, and reasonably foreseeable future actions . . . ."  40

CFR § 1508.7.  Other proposals pending at the time an EIS is prepared are reasonably foreseeable for purposes of cumulative effects analysis. *See Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) (holding that "when several proposals for . . . related actions that will have cumulative or synergistic environmental impact . . . are pending concurrently before an agency, their environmental consequences must be considered together.").  FERC failed to take a hard look at the cumulative impacts of the Project with other liquid natural gas export applications pending at the time.

FERC issued the draft EIS for the Project which has an export capacity of 1.8 billion cubic feet of liquid natural gas per day.  DEIS ES-2.  Concurrently, applications for several other liquified natural gas export terminals were pending before FERC or had already been granted.[21]  Together, all export projects have an export capacity of 10.7

_____

[21] FERC had issued two authorizations and one draft EIS for a project not yet authorized, and FERC had received four other applications (the two authorizations and one application all concerned a single terminal site). *Sabine Pass Liquefaction, LLC and Sabine Pass LNG, L.P.,* 139 FERC ¶ 61,039 (2012) and *Sabine Pass Liquefaction, LLC and Sabine Pass LNG, L.P.,* 146 FERC ¶ 61,117 (Feb. 20, 2012) (together, authorizing 2.76 bcf/d); Cameron LNG, LLC and Cameron Interstate, LLC, 79 Fed. Reg. 3197, FERC Dockets CP13-25 and CP13-27 (Jan. 17,

billion cubic feet of liquefied natural gas per day.  In 2013, the United

States produced approximately eighty billion cubic feet of natural gas

per day.  20140505-5230 (Exhibit 57).  The Freeport Project accounts for

only about 2.25 percent of the daily national production of natural gas.

Taken together, however, all of these export projects account for

approximately 15.6 percent of current U.S. natural gas production.[22]  As

these numbers indicate, each of these projects, individually, has

significant environmental impacts; when considered cumulatively, these

impacts are even more obvious.  Nor would such an analysis have been

difficult or fruitless.  *See N.Y. Natural Res. Def. Council, Inc. v. Kleppe*,

429 U.S. 1307, 1311 (1976) (holding that an agency may not limit the

---

2014) (draft EIS for 1.7 bcf/d); Corpus Christi Liquefaction, 77 Fed. Reg.
58368, FERC Dockets CP12-507, CP12-508 (Sept. 20, 2012) (2.1 bcf/d);
Dominion Cove Point LNG, 78 Fed. Reg. 23552, FERC Docket CP13-113
(Apr. 19, 2013) (0.77 bcf/d); Jordan Cove Energy Project, 78 Fed. Reg.
34089, FERC Docket CP13-483 (June 6, 2013) (0.8 bcf/d); LNG
Development Company (d/b/a Oregon LNG), 78 Fed. Reg. 38703, FERC
Dockets CP09-6 and CP09-7 (June 27, 2013) (1.25 bcf/d); Sabine Pass
Liquefaction Expansion, 78 Fed. Reg. 62344, FERC Dockets CP13-552
and CP13-553 (Oct. 18, 2013) (1.38 bcf/d).
[22] This number comes from the 1.8 billion cubic feet of natural gas per
day that Freeport will export combined with the 10.7 billion cubic feet
per day of already pending LNG export projects, which is then divided
by the amount of natural gas produced in the United States per day in
2013.

scope of inquiry unless "evaluation of the project . . . [would be] so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible.").

Each of these pending projects have quantifiable export capacity and emissions profile that FERC already has, or will have to, analyze in granting individual approval(s).  Thus, FERC acted arbitrarily and capriciously when it analyze cumulative impacts as articulated in 40 C.F.R § 1508.8.

## III. FERC Failed to Inform Decisionmakers and the Public of the Project's Total Air Pollution By Failing to Quantify Air Pollution Related to the Project's Electricity Consumption.

FERC's partial analysis of the emissions impacts from the Project's electricity use is both incomplete and misleading. FERC provided decision-makers and the public with only a partial analysis of the Project's air emissions. The electric motors that power the Project's refrigeration units require 600 to 700 megawatts of electricity on an almost constant basis.[23] EIS 1-15; FEIS F-7. The EIS does not include a

_____

[23] This amount of power is roughly the output of the average coal-fired power plant in the United States, and is greater than the output of the average gas-fired power plant.

36

discussion of the total air pollutants associated with this power
generation. As a result, the EIS significantly understates the Project's
emissions.

For example, though the EIS states that the Project will cause
1,620,443 tons per year of carbon dioxide equivalent emissions:
1,580,907 from stationary sources, EIS 4-211, and 39,536 tons from
vessels, EIS 4-218, the EIS fails to provide the number of tons per year
for air pollution emissions from the generation of electricity needed to
power the Project. Instead, an appendix to the EIS states that each
megawatt-hour of electricity used by the Project will lead to emission of
1,296.2 pounds of carbon dioxide equivalent and other pollutants. EIS
F-7. By reporting in pounds per megawatt rather than tons per year (as
it does with other pollutants) FERC masks the Project's total
emissions—1.62 million tons per year versus 5.59 million tons per year
of carbon dioxide equivalent.[24]   In so doing, the EIS fails to fully

---

[24] 700 megawatts of power over the course of a year requires 6,132,000
megawatt-hours (number of megawatts multiplied by number of hours
in a year). FERC provides that the generation of one megawatt hour of
electricity will cause emissions of 1,296.2 pounds of carbon dioxide
equivalent (table F-4, FEIS F-7). Multiplying this figure by the number
of megawatt-hours per year required by the Project (1,296.2 lbs CO2e x

informed decisionmakers and the public about the full extent of the

Project's air of air emissions.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that

this Court grant the petition for review, set aside the Rehearing Order

and Authorization Order, and remand to FERC for additional NEPA

review of the effects of the proposed action.

Dated: March 13, 2015                    Respectfully submitted,


                                         _____/s/_____
                                         Nathan Matthews
                                         Sierra Club Environmental Law
                                              Program
                                         85 Second Street, Second Floor
                                         San Francisco, CA 94105-3456
                                         Telephone: (415) 977-5695
                                         Facsimile: (415) 977-5793


                                         Deborah A. Sivas
                                         Alicia E. Thesing
                                         Matthew J. Sanders
                                         Environmental Law Clinic
                                         Mills Legal Clinic at Stanford

---

6,132,000 MW-hr/yr) equals the pounds of carbon dioxide equivalent indirectly caused by the Project's electricity demands. Converting this number into tons (one pound equals 0.0005 tons) to match FERC's other evaluations of other sources of air pollutants (*see, e.g.*, table 4.11.1-5, FEIS 4-211), equals 3.97 million tons per year of carbon dioxide equivalent from the Project's electricity use.

Law School
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone: (650) 723-0325
Facsimile: (650) 723-4426

Michael Robinson-Dorn
University of California
Irvine School of Law
Environmental Law Clinic
401 E. Peltason Drive, Suite 4500
Irvine, CA 92697-8000
Telephone: (949) 824-1043

Certificate of Compliance with Type-Volume Limitation, Typeface
Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R.
      App. P. 32(a)(7)(B) because:

      ☑    this brief contains 7,587 words, excluding the parts of the brief
           exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

      ☐    this brief uses a monospaced typeface and contains [*state the
           number of*] lines of text, excluding the parts of the brief
           exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App.
      P. 32(a)(5) and the type style requirements of Fed. R. App.P.
      32(a)(6) because:

      ☐    this brief has been prepared in a proportionally spaced typeface
           using [*state name and version of word processing program*] in
           [*state font size and name of type style*], *or*

      ☐    this brief has been prepared in a monospaced typeface using
           [*state name and version of word processing program*] with
           [*state number of characters per inch and name of type style*].

           (s)_____
                Attorney for Petitioners_____
                Dated:_____

# CERTIFICATE OF SERVICE

In accordance with Fed.R. App. P. 25(d) and the Court's Administrative Order Regarding Electronic Case Filing, I certify that on March 13, 2015, I served the foregoing **BRIEF OF PETITIONERS SIERRA CLUB and GALVESTON BAYKEEPER** on the counsel identified below by Notice of Docket Activity through the Court's CM/ECF noticing system:

Robert Harris Solomon, Solicitor
Federal Energy Regulatory
   Commission
Office of the Solicitor
888 First Street, NE
Washington, DC 20426
robert.solomon@ferc.gov

Karin Lea Larson
Federal Energy Regulatory
   Regulatory Commission
Office of the Solicitor
888 First Street, NE
Washington, DC 20426
Karin.Larson@ferc.gov

Stacy Renee Linden
American Petroleum Institute
1220 L Street, NW
Suite 900
Washington, DC 20005-4070
lindens@api.org

Benjamin Norris IV
American Petroleum Institute
1220 L Street, NW
Suite 900
Washington, DC 20005-4070
norrisb@api.org

Catherine Emily Stetson
Hogan Lovells US LLP
Columbia Square
555 13th Street, NW
Washington, DC 20004-1109
cate.stetson@hoganlovells.com

Jonathan Saul Franklin
Norton Rose Fulbright US LLP
801 Pennsylvania Avenue, NW
   Suite 500
Washington, DC 2004-2623
Jonathan.Franklin@
   nortonrosefulbright.com

Charles Russell Scott
Norton Rose Fulbright US LLP
666 Fifth Avenue
New York, NY 10103-3198
charles.scott@
    nortonrosefulbright.com

Lisa M. Tonery
Norton Rose Fulbright US LLP
666 Fifth Avenue
New York, NY 10103-3198
lisa.tonery@
    nortonrosefulbright.com

_____

    Deborah A. Sivas