**ORAL ARGUMENT NOT YET SCHEDULED**

# In the United States Court of Appeals for the District of Columbia Circuit

### No. 14-1275
_____

SIERRA CLUB AND GALVESTON BAYKEEPER,
*Petitioners*,
*v.*
FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*,
AMERICAN PETROLEUM INSTITUTE, *et al.*,
*Intervenors*.
_____

## ON PETITION FOR REVIEW OF ORDERS OF THE FEDERAL ENERGY REGULATORY COMMISSION
_____

## FINAL REPLY BRIEF OF PETITIONERS SIERRA CLUB AND GALVESTON BAYKEEPER
_____

Sanjay Narayan
Nathan Matthews
Sierra Club Environmental Law Program
85 Second Street, Second Floor
San Francisco, CA 94105-3456
Telephone: (415) 977-5695
Facsimile: (415) 977-5793
Sanjay.narayan@sierraclub.org
*Counsel for Petitioners Sierra Club and Galveston Baykeeper*

July 17, 2015

# TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................... i

TABLE OF AUTHORITIES................................................................iii

GLOSSARY OF ABBREVIATIONS .............................................vii

STATUTES AND REGULATIONS...................................................viii

SUMMARY ..........................................................................................1

ARGUMENT .........................................................................................2

  I.  **Sierra Club Has Demonstrated Standing, and This Case Is
Not Moot**.........................................................................................2

    A.  *Sierra Club's Local Injuries Are Sufficient to Provide Standing.*
........................................................................................................2

    B.  *The Department of Energy's Reports Do Not Render this Case
Moot*..............................................................................................5

  II.  **The Commission's Decision Has Reasonably Foreseeable
Effects on the Production and Use of Natural Gas in the
United States**..............................................................................10

    A.  *NEPA Does Not Allow the Commission to Ignore Indirect
Impacts As Causally Unrelated to Its Decision.*.............................11

    B.  *The Commission Could Not Ignore Otherwise Foreseeable
Effects Based on Uncertainty as to Those Effects' Extent.*.................23

    C.  *The Commission Could Not Lawfully Ignore Changes in the Use
of Gas and Coal Resulting from Increased Exports.*.........................30

  III.  **The Commission Was Required to Assess the Cumulative
Impacts of Other Export Authorizations**.....................................32

  IV.  **The Commission Failed to Adequately Disclose Indirect
Air Pollution from Electricity Consumption**.............................34

i

**CONCLUSION**........................................................................**35**

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION** .**37**

**CERTIFICATE OF SERVICE** ...........................................................**38**

# TABLE OF AUTHORITIES

**Cases**

*Andrus v. Sierra Club,* 442 U.S. 347 (1979) .........................................6, 7

*Ass'n of Battery Recyclers v. E.P.A.,* 716 F.3d 667 (D.C. Cir. 2013) .........3

*Barnes v. U.S Dep't of Transp.,* 655 F.3d 1124 (9th Cir. 2011) ..............20

*Center for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,* 538 F.3d 1172 (9th Cir. 2008).............................................................29

*Citizens Against Burlington v. Busey,* 938 F.2d 190 (D.C. Cir. 1991)......8

*City of Dallas v. Hall,* 562 F.3d 712 (5th Cir. 2009) ...............................17

*City of Davis v. Coleman,* 521 F.2d 661 (9th Cir. 1975) ................... 16, 20

*Coliseum Square Association v. Jackson*, 465 F.3d 215 (5th Cir. 2006) 28

*Colorado River Indian Tribes v. Marsh,* 605 F. Supp. 1425 (C.D. Cal. 1985)....................................................................................................16

*Daingerfield Island Prot. Society v. Lujan,* 920 F.2d 32 (D.C. Cir. 1990) 9

*Delaware Dep't of Nat. Res. & Env. Control v. EPA,* 785 F.3d 1 (D.C. Cir. 2015).....................................................................................................3

*Delaware Riverkeeper Network v. FERC,* 753 F.3d 1304 (D.C. Cir. 2014) ............................................................................................ 24, 25, 33

*Dep't of Transp. v. Public Citizen,* 541 U.S. 752 (2004)................... 13, 14

*Kelley v. EPA,* 15 F.3d 1100 (D.C. Cir. 1994)...........................................6

*Mayo Found. v. Surface Transp. Bd.,* 472 F.3d 545 (8th Cir. 2006) ......26

*Mid States Coal. for Progress v. Surface Transp. Bd., 345 F.3d 520 (8th Cir. 2003) ........................................................................... 12, 15, 20, 23

Minisink Residents for Env. Preservation & Safety v. FERC, 762 F.3d 97 (D.C. Cir. 2014) ................................................................................. 3

Myersville Citizens for a Rural Community v. FERC, 783 F.3d 1301 ..... 5

Nat'l Ass'n for the Advancement of Colored People v. Fed. Power Comm'n, 425 U.S. 662 (1976) ............................................................ 14

New Jersey Dep't of Envtl. Prot. v. Nuclear Reg'y Comm'n, 561 F.3d 132 (3rd Cir. 2009) ............................................................................ 14

New York v. Nuclear Reg'y Comm'n, 681 F.3d 471 (D.C. Cir. 2012) 15, 21

North Carolina Wildlife Fed'n v. North Carolina Dep't of Transp., 677 F.3d 596 (4th Cir. 2012) ............................................................... 35

Potomac Alliance v. U.S. Nuclear Reg'y Comm'n, 682 F.2d 1030 (D.C. Cir. 1982) ................................................................................... 24

Public Citizen v. Nat'l Highway Traffic Safety Admin., 848 F.2d 256 (D.C. Cir. 1988) ............................................................................ 6, 21

San Luis Mothers for Peace v. Nuclear Reg'y Comm'n, 449 F.3d 1016 (9th Cir. 2006) ............................................................................... 14

Scientists' Inst. for Pub. Info. v. Atomic Energy Inst., 481 F.2d 1079 (D.C. Cir. 1973) ............................................................................ 24

Sierra Club v. EPA, 774 F.3d 383 (7th Cir. 2014) ................................ 25

Sylvester v. U.S. Army Corps of Engineers, 884 F.2d 394 (9th Cir. 1989) ....................................................................................................... 16

TOMAC, Taxpayers of Michigan v. Norton, 433 F.3d 852 (D.C. Cir. 2006) ...................................................................................... 32, 33

*Turlock Irrigation District v. FERC,* 786 F.3d 18 (D.C. Cir. 2015)..........3

*WildEarth Guardians v. Jewell,* 738 F.3d 298 (D.C. Cir. 2013) .... 4, 5, 25

**Statutes**

15 U.S.C. § 717b(a)...................................................................................14

42 U.S.C. § 4331(b)(3)..............................................................................23

**Rules**

Fed. R. Civ. P. 28(j)....................................................................................4

**Federal Regulations**

40 C.F.R. § 1501.7 .....................................................................................8

40 C.F.R. § 1502.14 ...................................................................................8

40 C.F.R. § 1502.22 ...............................................................................8, 19

40 C.F.R. § 1504.3 .....................................................................................9

40 C.F.R. § 1508.25(a)(1)(iii) ...................................................................33

40 C.F.R. § 1508.7 ...................................................................................33

*40 C.F.R. § 1508.8(b) .............................................................................12

40 C.F.R. 1500.1(c) ....................................................................................9

**Administrative Cases**

148 FERC 61076 (July 30, 2014) ............................................................10

DOE Delegation Order No. 0-044.00A ........................................................5

DOE/FE Order 3282 (May 20, 2013) ........................................................19

**Other Authorities**

Council on Environmental Quality, Revised Draft Guidance on
    Greenhouse Gas Emissions in NEPA Reviews, 79 Fed. Reg. 77,802
    (Dec. 24, 2014) ........................................................29

Memorandum for Heads of Federal Departments & Agencies from
    Nancy H. Sutley (Feb. 18, 2010) ........................................................29

*U.S. Dep't of Energy, Addendum to Environmental Review Documents
    Concerning Exports of Natural Gas from the United States (August
    2014).................... 8, 10, 13, 17, 18, 20, 21, 23, 24, 26, 27, 28, 30, 31, 32

*Authorities chiefly relied upon are marked with an asterisk.

## GLOSSARY OF ABBREVIATIONS

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief, and in the cited portions of the Joint Appendix:

| | |
|---|---|
| bcf/d | Billion cubic feet per day |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FERC | Federal Energy Regulatory Commission |
| JA | Joint Appendix |
| LNG | Liquefied Natural Gas |
| NEPA | National Environmental Policy Act |
| P or PP | The internal paragraph number or numbers within a FERC order. |

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in an addendum.

## SUMMARY

The Commission has authorized the construction and operation of an export terminal – the Freeport Project – that will serve as a bridge between isolated U.S. natural gas supplies, and fierce international demand for that gas. By connecting supply and demand, the Commission's decision will affect the price, production, and use of natural gas in the United States – consequences that the agency refused to acknowledge in its environmental impact statement. Corrected Brief of Petitioners ("Opening") at 20-33. The Commission and intervenors respond by asserting that these effects are 'speculative,' and that uncertainty as to their precise extent relieves the Commission from its obligation to consider them under NEPA. Neither the record nor the law supports those assertions. The record squarely – and without substantive contradiction – establishes that the exports enabled by the Commission's decision will increase the production of natural gas in the United States, and increase the use of coal for electricity generation. *See* Section II.A, *below*. Any uncertainty as to the precise location and extent of those changes does not allow FERC to ignore their effects. *See* Section II.B, *below*. In light of its obligation to

1

consider those broader effects, the Commission could not exclude its other export-facility approvals from its 'cumulative effects' analysis. *See* Section III, *below*. And the agency's statement failed to adequately disclose the air quality effects of the electricity that the Freeport facility will consume. *See* Section IV, *below*.

## ARGUMENT

## I.    SIERRA CLUB HAS DEMONSTRATED STANDING, AND THIS CASE IS NOT MOOT

The Commission first urges this Court not to reach those merits. It asserts that the petitioners lack standing and that this case is moot. Neither assertion is correct.

*A. Sierra Club's Local Injuries Are Sufficient to Provide Standing.*

Sierra Club submitted declarations from members who reside and recreate in the vicinity of the Freeport terminal. Declaration of Teresa Cornelison ¶¶ 2, 6-8 ("Cornelison Decl."); Declaration of Melanie Oldham ¶¶ 2, 6-15.[1] The "noise pollution generated from the ships, tugboats, and associated activity" at the Freeport facility hinder one

---

[1] Petitioners also submitted a declaration from a member harmed by delivery of natural gas to the project site. Declaration of Michael Hershey. This Court need not decide whether those harms also confer jurisdiction under Article III.

such member's enjoyment of her home, and "[i]f the terminal were built, [she] would not go outside to relax or walk on the beach as frequently." Cornelison Decl. ¶¶ 8, 10. These are "precisely the kinds of harms the Supreme Court has deemed sufficient to show injury in fact" under Article III. *Ass'n of Battery Recyclers v. EPA,* 716 F.3d 667, 672-73 (D.C. Cir. 2013).[2]

The Commission contends that to establish standing Sierra Club must "show[] a concrete and imminent injury *related to increased natural gas production* … caused by the challenged FERC orders," because its claims concern such increased production. Brief of Respondent Federal Energy Regulatory Commission ("Response") 24 (emphasis added).[3] But that is not the law: a petitioner need not

---

[2] This Circuit has firmly established petitioners' standing to challenge the Commission's approval of a project that "harm[s] their aesthetic, health, and property interests," *Minisink Residents for Env. Preservation & Safety v. FERC,* 762 F.3d 97, 106 (D.C. Cir. 2014) (internal citation omitted). Consequently, petitioners' opening brief did not include a separate section to address standing. Because "it was reasonable for [the petitioners] to believe that [their standing] was self-evident," petitioners respectfully request that this Court exercise its discretion to permit that omission. *Delaware Dep't of Nat. Res. & Env. Control v. EPA,* 785 F.3d 1, 9 (D.C. Cir. 2015).

[3] The Commission submitted *Turlock Irrigation District v. FERC,* 786 F.3d 18, 22 (D.C. Cir. 2015), as supplemental authority under Fed. R.

demonstrate standing based solely upon the effects that the Agency overlooked in its NEPA analysis. So long as a party's "aesthetic injury follows from an inadequate [environmental impact statement]," it does not matter "whether or not the inadequacy concerns the same environmental issue that causes [its] injury." *WildEarth Guardians v. Jewell,* 738 F.3d 298, 307 (D.C. Cir. 2013) ("[R]ecreational and aesthetic interests, 'which [were] uniformly local'" are sufficient to create standing, even where claims assert that impact statement failed to adequately address global climate change).

Here, as in *WildEarth Guardians,* the Sierra Club has alleged harms that are directly caused by the agency's order: aesthetic and recreational injuries resulting from the construction and operation of the Freeport facilities. Cornelison Decl. ¶¶6-10. Here, as in *WildEarth Guardians,* the challenged action "may have been wrongly decided," because of the agency's failure to comply with NEPA, and vacatur would allow the Commission to "change its mind." 738 F.3d at 306.

---

Civ. P. 28(j). That case has no bearing on the direct injuries that underlie Petitioners' standing.

Consequently, as in *WildEarth Guardians*, Sierra Club has

standing. *Id.*[4]

   B. *The Department of Energy's Reports Do Not Render this Case*
      *Moot.*

   The Commission also proffers "two environmental reports published

by the Department of Energy," Response 28, which describe the

"environmental aspects of the [liquefied natural gas] production and

export chain," including "potential environmental impacts on resources,

including air quality and climate change, arising from future natural

gas production." Response 30. According to FERC, those reports have

"addressed Sierra Club's concerns," rendering this case moot.  *Id.* at 4.

That badly misunderstands both Sierra Club's 'concerns,' and NEPA's –

---

[4] The Commission also suggests that this Court's Article III jurisdiction
is limited because the "Natural Gas Act differentiates between review of
[liquefied natural gas] export decisions (the Department's
responsibility) and the specific [liquefied natural gas facilities] (for the
FERC to review)." Response 25, *but see Myersville Citizens for a Rural
Community v. FERC*, 783 F.3d 1301, 1315-16 (D.C. Cir. 2015) (rejecting
conflation of statutory and standing issues). The Natural Gas Act does
not prescribe that division – it is a product of agency practice, not
statute. *See* DOE Delegation Order No. 0-044.00A. And in any event,
Sierra Club's injuries are directly caused by the construction and
operation of the Freeport facility, for which FERC accepts
responsibility.

to ensure that environmental impacts inform the Commission's
*decision-making.  Andrus v. Sierra Club,* 442 U.S. 347, 350 (1979).

The Department of Energy's reports played no role in the
Commission's decision; they merely provide *post hoc* confirmation that
FERC's action will, in fact, have substantial environmental effects.
Noting those impacts after the fact cannot substitute for their
evaluation during the decision-making process. *See Public Citizen v.
Nat'l Highway Traffic Safety Admin.*, 848 F.2d 256, 267 n.43 (D.C. Cir.
1988) (noting the "importance of [environmental impact statement]
requirement in inhibit[ing] *post hoc* rationalizations of inadequate
environmental decisionmaking") (alteration in original, citation
omitted).

The two reports cited by the Commission were not part of its decision
to authorize the Freeport terminal. They post-date the Commission's
final environmental impact statement. Neither was within the
Commission's record, or mentioned in its decision. *See also Kelley v.
EPA,* 15 F.3d 1100, 1107 (D.C. Cir. 1994) (decision-making rationale
must be established *"on the administrative record"*). Conversely, the
reports themselves do not discuss or specifically analyze the

6

Commission's decision to authorize the Freeport terminal. The Department of Energy's 'reports' were, in short, entirely separate from the Commission's decision-making for the Freeport facility.[5] As such, they cannot vitiate FERC's failure to comply with NEPA.

"The thrust of [NEPA] is … that environmental concerns be integrated into the very process of agency decision-making." *Andrus,* 442 U.S. at 350. That central purpose cannot be met by merely describing the environmental consequences of a decision, in documents divorced from the Commission's planning and decision-making. "The detailed statement [NEPA] requires is the outward sign that environmental values and consequences have been considered *during the planning stage of agency actions*." *Id.* (emphasis added).

Relatedly, the reports do not meet NEPA's substantive and procedural requirements – requirements that are critical to the meaningful incorporation of environmental analysis into the agency's decision-making. For example, the reports do not include the

---

[5] The intervenors argue, indeed, that materials from the "separate public interest determination" undertaken by the Department of Energy are incapable of meaningfully informing the Commission's decisions. Freeport 25.

"discussion of alternatives" to the proposed Freeport terminal that "forms 'the heart of the environmental impact statement.'" *Citizens Against Burlington v. Busey,* 938 F.2d 190, 194 (D.C. Cir. 1991) (citing 40 C.F.R. § 1502.14). *See* U.S. Dep't of Energy, Addendum to Environmental Review Documents Concerning Exports of Natural Gas from the United States at 106 (August 2014) *available at* http://energy.gov/sites/prod/files/2014/08/f18/Addendum.pdf  ("August Addendum") (Department "clearly stated the [report] was not required by NEPA and simply cannot provide detailed [environmental] analysis," and "was not intended to be an alternatives analysis, nor was it intended to be a comprehensive evaluation"). The reports do not follow NEPA's requirements as to areas of uncertainty. *Compare* 40 C.F.R. § 1502.22 (where information is unavailable, requiring agency to, *inter alia,* summarize existing credible scientific evidence,  evaluate impacts with generally accepted research methods) *with* August Addendum at 2 (asserting that lack of information prevents any meaningful analysis of "specific environmental impacts").

The Department of Energy did not undertake public notice-and-comment as to the proper scope of the reports. 40 C.F.R. § 1501.7

(requiring "early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action"). And the reports do not observe NEPA's detailed rules regarding responses to comments. *Compare* 40 C.F.R. § 1504.3 *with* August Addendum at 128 (responding to "representative comments" and "broad categories of concerns" rather than providing "exhaustive" response to each comment). *Cf.* Response 28 (asserting that the Department of Energy "followed NEPA's notice and comment procedures" in issuing the reports).

The Department of Energy's reports played no part in the Commission's decision-making, and did not include the procedures and substance required under NEPA to ensure that environmental considerations inform such decision-making. Such "paperwork," given no role in the agency's "action," cannot substitute for compliance with NEPA, 40 C.F.R. § 1500.1(c), or carry the "heavy burden" necessary to demonstrate mootness, *Daingerfield Island Prot. Society v. Lujan,* 920 F.2d 32, 36 (D.C. Cir. 1990) (citations omitted).

II.    THE COMMISSION'S DECISION HAS REASONABLY FORESEEABLE EFFECTS ON THE PRODUCTION AND USE OF NATURAL GAS IN THE UNITED STATES

By authorizing the Freeport terminal, the Commission has enabled the export of 1.8 billion cubic feet of natural gas each day. 148 FERC ¶ 61,076 (July 30, 2014) ("Authorization Order") PP 1, 2, 17, JA1189, 1193.[6] Combining Freeport with the other projects approved or pending before the Commission, the Commission will have approved exports totaling 12.5 billion cubic feet per day, Opening 17 & n.11 – a volume equivalent to *19% of the nation-wide* demand for natural gas that would otherwise exist. Export Study, Table B5, JA0556. *See* Opening 13 n.7.

This additional demand will dramatically alter the U.S. natural gas market. As the Energy Information Administration has concluded, it will foreseeably cause: (1) "increased gas prices"; (2) "increased natural gas production," in response to those higher prices; and (3) a reduction in the use of natural gas by domestic power plants, as "higher [gas] prices" lead to "shifts to coal-fired generation." Export Study 6, JA0529. None of the respondents dispute that those effects would have major

_____

[6] This reply adopts the same short-forms as petitioners' opening brief.

environmental consequences, or that the Commission's environmental impact statement failed to consider these consequences.

Instead, the respondents claim that the Commission could lawfully ignore the effects of increased exports on the price, production, and use of natural gas domestically, because these effects are not "indirect impacts of the Commission's approval of the Freeport Project." Response 31-32. Respondents contend, first, that the Commission's approvals are not the "cause" of any changes in the production and use of natural gas that will result from increased exports. Response 32-39; Brief for Respondent-Intervenors Freeport LNG *et al.* ("Freeport") 32-35. And second, they assert that those changes are not "reasonably foreseeable." Response 39-43; Freeport 19-32. The administrative record, and the governing law, refute both those arguments.

### A. NEPA Does Not Allow the Commission to Ignore Indirect Impacts As Causally Unrelated to Its Decision.

The Commission defends its decision to ignore any increases in the production of natural gas, or in coal-fired generation, that might result from its decision, by insisting that they are not "'caused by' the siting, construction, and operation of the Project,'" Response 32, and "not a link in the same causal chain," *id*. 35. *See id*. 43. In support, it contends that

"there is no record evidence that any increase in natural gas production is *directly* associated with the Freeport Project." Response 33 (emphasis added). But NEPA does not limit the Commission's obligations to those effects 'directly associated' with the project; it expressly encompasses *in*direct effects, even those "later in time or farther removed in distance." 40 C.F.R. § 1508.8(b).

The Commission has authorized facilities and operations whose sole purpose is the export of natural gas. That exported natural gas has to be supplied from some source – either increased production, or the gas being used at facilities elsewhere. The "causal relationship" between the Freeport export facility and the production (or diversion) of the natural gas needed to supply it is every bit as close as the other 'indirect effects' routinely required in a NEPA analysis. "[I]nduced changes in the pattern of land use, population density or growth rate" are all impacts that are similarly caused by agency decisions, in conjunction with other foreseeable factors and influences. 40 C.F.R. § 1508.8(b); *see Mid States Coal. for Progress v. Surface Transp. Bd.,* 345 F.3d 520, 549-50 (8th Cir. 2003) (requiring agency to consider air quality effects of changes in use

of coal that will result, when approving rail line that will increase supply to domestic coal market).

The Commission argues, nevertheless, that its decision will not be the "the legally relevant cause" of increased natural gas production, or increased use of coal – even though, absent its approval of export facilities, there would be virtually no connection between overseas demand for natural gas and the United States. *See* Export Study 4, JA0527 (noting United States is not integrated with international gas markets). In support, FERC cites *Department of Transportation v. Public Citizen,* 541 U.S. 752, 770 (2004). But that case permits an agency to ignore only those effects that it "has no ability to prevent … due to its limited statutory authority over the relevant actions," and where it has "no statutory authority to impose … [pertinent] environmental requirements." *Id.* at 759, 770. The statutory provision at issue in *Public Citizen* provided the Department of Transportation with cabined authority to determine only whether foreign motor carriers had satisfied its "safety and financial" rules. *Id.* at 766. Because the Department lacked authority to prevent compliant carriers from entering the country, or to limit their air pollution, it could

lawfully ignore the air-quality impacts of those carriers' travel within the United States. *Id.* at 770 (finding that under those circumstances, "the agency cannot be considered a legally relevant 'cause'" of those effects).

Here, in contrast, the Commission's statutory authority is expressly over the "export" of natural gas, and those exports cannot occur without the liquefaction infrastructure that the Commission is approving. 15 U.S.C. § 717b(a). The Commission has authority to address environmental concerns. *See Nat'l Ass'n for the Advancement of Colored People v. Fed. Power Comm'n*, 425 U.S. 662, 669-70, n.6 (1976). *Public Citizen* provides no basis for the Commission to ignore otherwise foreseeable (indeed, foreseen) effects of natural gas exports in its impact statement. *Cf. New Jersey Dep't of Envtl. Prot. v. Nuclear Reg'y Comm'n,* 561 F.3d 132, 140 (3rd Cir. 2009) (finding causation attenuated between agency decision to relicense existing nuclear facility, and possible terrorist attack on facility). *But see San Luis Mothers for Peace v. Nuclear Reg'y Comm'n,* 449 F.3d 1016, 1031 (9th Cir. 2006) (holding that where agency authorizes construction of new facility, it must consider effects of possible terrorist attack on facility).

14

The Freeport intervenors point out that "State and local authorities" will regulate the production and transport of any additional natural gas that will be produced to fulfill export-related demand; they contend that this allows the Commission to disavow the increase in natural gas production that will result from its actions. Freeport 34. *See also* Brief of Intervenor American Petroleum Institute at 8-9 (noting that oil and gas industry is subject to environmental and other regulations). But NEPA requires FERC to consider impacts regulated by other entities. *Mid States,* 345 F.3d at 549-50 (requiring Surface Transportation Board to consider effects of coal burned in power plants). The record demonstrates that, notwithstanding state and local regulation, natural gas production caused by the Commission's decision will have predictable environmental consequences.

"NEPA requires that 'environmental issues be considered at every important stage in the decision making process.'" *New York v. Nuclear Reg'y Comm'n,* 681 F.3d 471, 476 (D.C. Cir. 2012) (internal citations omitted). Whether to construct and operate the physical facilities necessary to export natural gas is an 'important stage' in a decision-making process that could profoundly alter the price, production, and

use of natural gas in the United States. That other subsequent decisions will affect the magnitude of the resulting environmental impacts does not relieve the Commission's obligation to assess them under NEPA at this critical, threshold stage.

The Commission also compares this case to *Sylvester v. U.S. Army Corps of Engineers,* in which the Ninth Circuit found that the Corps need not, when permitting the fill of certain wetlands for a golf course, assess the effects of resort development adjacent to those wetlands. 884 F.2d 394, 401 (9th Cir. 1989). But the Ninth Circuit did so only because the record before it demonstrated that the filling of the wetlands would not materially affect the development of the resort. *Id.* at 400.

The Ninth Circuit recognized, in *Sylvester,* that where an agency, for example, "stabiliz[es] a river bank," it must consider in its impact statement the effects of "private housing built as a result," *id.* (citing *Colorado River Indian Tribes v. Marsh,* 605 F. Supp. 1425, 1433 (C.D. Cal. 1985); and that where an agency permits "an interstate highway interchange," it must address "commercial development" that will be enabled by that interchange, *id.* at 401 n.3 (citing *City of Davis v. Coleman,* 521 F.2d 661, 671 (9th Cir. 1975)). The Ninth Circuit did not,

16

in other words, sanction an agency's decision to ignore otherwise foreseeable results, based on a fictionally constrained understanding of 'legal' causation; it found, on the record before it, that the golf course would not materially influence the likelihood of the resort's development, or its contours.[7]

The record here is markedly different. The *only* material within it addressing the effects of additional exports on domestic production and use of natural gas concludes that: exports will cause "increased natural gas production" (primarily from "shale sources") and that this production will be the source of "60 to 70 percent" of newly authorized exports. Export Study 6, JA0529. *See also Freeport LNG Development, L.P.*, Application for Authorization, Docket No. CP12-509-000, 3, 14

---

[7] The Freeport intervenors cite *City of Dallas v. Hall,* 562 F.3d 712 (5th Cir. 2009), as an example of a case in which the agency properly ignored some speculative effects. Freeport 18. In *Hall,* the agency refused to consider consequences to a city's water supply that might follow from establishing a wildlife refuge on one site of a possible future reservoir. 562 F.3d at 718-19. The record, however, indicated that there was never any "commit[ment] to constructing [a] reservoir," at the site, and that an equivalent reservoir might be constructed "at another site." *Id.* at 719. In this case, in contrast, the record contains a detailed analysis establishing that the pertinent effects are likely to occur, and there is nothing in the record (beyond the Commission's naked speculation) to suggest that natural gas will be in equivalent demand even without export capacity.

(Aug. 31, 2012) ("Application"), JA0132, 0143. That same analysis also indicates that "the remaining portion" of exported natural gas would be "supplied by natural gas that would have been consumed domestically," forcing the "electric power sector" to primarily "shift[] to coal-fired generation." Export Study 6, JA0529.

There is no study, data, or other analysis in the record that contradicts those conclusions. And the Commission's brief does not meaningfully contest them: FERC states only that it does not know whether "the gas processed by the Freeport LNG facility will come from induced gas production" ("increased natural gas production" noted by the Export Study) or "existing production" (that is, natural gas currently being used domestically, whose users would be forced to "shift[]" to coal or other fuels, Export Study 6, JA0529). Response 38.

As an initial matter, the Export Study itself demonstrates that available tools can predict the balance between new production and reduced domestic use (and the results of such changes in production and use). *See, e.g.,* Export Study 10-13, JA0533-0536. Those same methods are available to the Commission. And even if the Commission lacked the information necessary to estimate this balance, NEPA imposes

specific requirements upon agencies faced by such unknowns. 40 C.F.R.

§ 1502.22. It does not permit the Commission, when faced with two

alternative sets of likely, significant effects, to ignore *both* – as it has

effectively done here. *See infra* Section III.C.

The Freeport intervenors would allow FERC to ignore the effects

detailed in the Export Study, because that Study acknowledges that

"broader market conditions" will affect the results of additional natural

gas exports. Freeport 22.[8] But virtually *every* indirect impact is subject

to 'market conditions' (that is usually why they are 'indirect'). Growth

effects depend upon the housing and construction market and

---

[8] The Freeport intervenors suggest that there is no reasonable means to predict whether its facility will produce *any* exports, or even be "financed and built." Freeport 22-23. Its decision to place "$14.0 billion in direct investment" in the terminal strongly suggests otherwise, http://www.freeportlng.com/Liquefaction_Project.asp, as does its announcement of 20-year export contracts for the gas produced by the terminal, http://www.freeportlng.com/PDFs/20120731_pr.pdf. And while the Export Study acknowledges that its predictions are – like any predictions – uncertain, it addresses those uncertainties and clearly concludes that the likely, foreseeable result of additional exports is increased natural gas production, and decreased availability of natural gas to domestic power plants. The Commission has not asserted that the market-related assumptions underlying the Administration's analysis are incorrect, or offered any alternative assessment as to likely market conditions – and the record contains nothing that would support any such assertion. *See* DOE/FE Order 3282 (May 20, 2013), FE Docket No. 10-161-LNG at 110, JA1360 (finding Export Study to be "fundamentally sound").

employment, *see City of Davis,* 521 F.2d at 674-75 (when agency allows "construct[ion of] a large interchange … in an agricultural area where no connecting road currently exists," it must consider "industrial, commercial, or residential development" that will result from "improved access and transportation"); coal-burning at power plants depends upon electricity demand and the price of alternative fuels, *see Mid States,* 345 F.3d at 549-50; increased airline traffic depends upon the demand for, and cost of, air travel, *see Barnes v. U.S Dep't of Transp.,* 655 F.3d 1124, 1138-9 (9th Cir. 2011) (when approving new runway at airport, agency must address effects of increased aviation activity enabled by that runway). In each of those cases, NEPA requires agencies to *evaluate* the effects of its actions on the market- not ignore them merely because they are subject to other market influences. The Export Study itself illustrates available methods for accommodating market uncertainties while providing a reasonable estimate of the impact of increased exports; the Study provides a variety of scenarios, and uses standard econometric techniques to identify a "reference case" as the most likely. Export Study 3-5, JA0526-0528. It also demonstrates that even in other

market scenarios, the effects will be largely similar: increased gas

production, and a domestic shift from gas to coal. *Id.*

   This is not a case in which a challenger speculates that an agency's

actions will have environmental effects that the agency has overlooked,

without record evidence that they will occur. Rather, the record

squarely and consistently indicates that the Commission's

authorization will have effects beyond those described in its

environmental impact statement; it is the agency who offers only its

speculation that, perhaps, these effects may be avoided. *See, e.g., Public

Citizen,* 848 F.2d at 267 ("A 'bald assertion that … two actions [are]

equivalent in their environmental impacts simply [does] not add up to

reasoned decisionmaking based upon a 'hard look' at the relevant

factors" (citation omitted)). Absent any basis in the record to contest the

Export Study's conclusion that, under most circumstances, the result of

increased exports will be increased natural gas production, and

increased use of coal at domestic power plants, the Commission could

not reasonably ignore those effects. *See New York*, 681 F.3d at 482-83 (if

the "probability of a given harm is nonzero," agency must "examin[e]

the consequences of the harm in proportion to the likelihood of its occurrence").

The Commission asserts, finally, that increased natural gas production, or decreased use of natural gas domestically, is not the "purpose" of the facility. Response 34. According to FERC, the Freeport Project is being built to profit from the "exportation of domestic natural gas to the global market," and (in these proceedings at least) its owners claim indifference as to whether the exported gas arrives from new production, or from existing supplies that are currently being used domestically (in preference to more polluting fuels). *Id.* 34-35 (citation omitted). *But see* n.12*, below.* As the Commission acknowledges, however, the Terminal's owner has concluded (like the Energy Information Administration) that "increased natural gas exploration and production" is a likely result of the terminal's approval. Response 34 (citing Application 3, 14, JA0132, 0143). That the terminal has other purposes does not allow the Commission to ignore that likely result. Indirect effects are, almost by definition, ancillary to the express, direct purpose of an action; NEPA was expressly enacted to ensure that such

"*unintended* consequences" are addressed. 42 U.S.C. § 4331(b)(3)

(emphasis added).

> ### B. The Commission Could Not Ignore Otherwise Foreseeable Effects Based on Uncertainty as to Those Effects' Extent.

The Commission also claims to be uncertain "how much" natural gas

production (and coal-fired electricity generation) will occur as a result of

its export-facility authorizations, or "where" such production (and coal

use) will occur; consequently, according to the Commission, it may

dismiss any such effects as not "foreseeable." Response 40. *See also*

Freeport 26-27 (arguing that "the location of [natural gas] production is

not reasonably foreseeable").

Uncertainty as to location and magnitude do not, however, relieve

FERC from its obligation to address the effects of its export-facility

authorizations on the production and use of natural gas. "When the

*nature* of the effect is reasonably foreseeable but its *extent* is not … [an]

agency may not simply ignore the effect." *Mid States*, 345 F.3d at 549-

50 (emphasis in original). The 'nature' of the effects that will result from

expanded export capacity are eminently foreseeable; indeed, the record

contains an extensive analysis expressly foreseeing them. Export Study

6, JA0529. As with any prediction, and any indirect impact, the precise

extent of increased exports' impact on the production and use of natural gas cannot be certainly known. *See Scientists' Inst. for Pub. Info. v. Atomic Energy Inst.,* 481 F.2d 1079, 1092 (D.C. Cir. 1973) (NEPA demands "[r]easonable forecasting and speculation").[9] But "[i]t is well recognized that a lack of certainty concerning prospective environmental impacts cannot relieve an agency of responsibility for considering reasonably foreseeable contingencies." *Potomac Alliance v. U.S. Nuclear Reg'y Comm'n,* 682 F.2d 1030, 1036 (D.C. Cir. 1982). Where the general nature of indirect effects can be ascertained, and those effects are significant, the "agency must issue an [environmental impact statement] analyzing the probabilistic facets of the prospective environmental impact." *Id.* at 1037.

---

[9] The Commission notes that the agency in *Scientists' Institute* had failed to prepare an environmental impact statement, whereas here FERC did assemble one. Resoponse 42-43. But FERC's statement excluded foreseeable impacts. Such an inaccurate statement violates NEPA, just as the lack of a statement does. FERC's justification echoes those rejected in *Scientists' Institute.* 481 F.2d at 1092 (claiming that effects require "crystal ball inquiry"). And, as in *Scientists' Institute*, the record directly contradicts the agency's assertion that the impacts cannot be meaningfully estimated. *Id. See* Export Study 6, JA0529. *Scientists' Institute* establishes that an agency violates NEPA by ignoring effects under those circumstances. 481 F.2d at 1092, *see also Delaware Riverkeeper Network v. FERC,* 753 F.3d 1304,1310 (D.C. Cir. 2014) (reaffirming this element of *Scientists' Institute*).

The effects of expanded exports on natural gas production and use in the United States are entirely susceptible to such 'probabilistic' assessment. *See Delaware Riverkeeper Network v. FERC,* 753 F.3d 1304, 1310 (D.C. Cir. 2014) (agency must address impacts unless "forecasting … is 'not meaningfully possible'"). The most serious of those effects – contributions to climate change, and ozone pollution – do not require "source locational information," Freeport 26-27.[10] *See* Opening 26-28. *See also WildEarth Guardians,* 738 F.3d at 309 (upholding environmental impact statement that addresses climate-related effects in general terms, without "link[ing] specific climatological changes, or the environmental impacts thereof, to the particular project or emissions"). And there are multiple tools available to make meaningful forecasts as to how much gas production and use will change in response to export-caused demand, and where (at least at a regional level) those changes will occur. Opening 27-31. *See also Mayo Found. v.*

---

[10] The Freeport Intervenors note that "the science of ozone formation, transport, and accumulation is complex." Freeport 27. Despite that complexity, agencies routinely address ozone impacts based on aggregate, region-wide estimates, without the precise geographic data whose lack the Commission cited to justify its refusal to address those impacts here. *See Sierra Club v. EPA,* 774 F.3d 383, 385, 397-99 (7th Cir. 2014).

*Surface Transp. Bd.,* 472 F.3d 545, 556 (8th Cir. 2006) (approving environmental impact statement that provides regional and national evaluation of effects, where precise locations are unknown).

The Commission distinguishes *Mid States,* and other cases establishing its obligation to address effects of uncertain extent, by claiming that here "neither the nature nor the extent" of the relevant impacts "is reasonably foreseeable." Response 40.[11] That claim cannot be reconciled with the record. The only substantive analyses in the record firmly forecast the nature of the indirect effects that will result from the Commission's actions: increased natural gas production, and decreased use of natural gas for domestic electricity production, in favor of coal. Export Study 6, JA0529. The Freeport intervenors' submissions

---

[11] The Commission also argues that "unlike the agency in *Mid States,* the Commission" acknowledged and considered "the cumulative impacts of foreseeable future shale gas and other gas production development within Brazoria County, Texas." Response 41. But the Commission did not consider the gas development that would result from its decision, even within Brazoria; its impact statement addresses only gas development that pre-dates Freeport's construction. EIS at 4-253, JA0991.

in the record are similarly unequivocal. Application 3, 14, JA0132, 0143.[12]

The Freeport intervenors contend that the Administration's Study is "broad statistical data" that the Commission could lawfully ignore. Freeport 18. But the Study is hardly broad. It is directed at – indeed, was commissioned to answer – precisely the question that the Commission has ignored: what "impact" "increased domestic natural gas demand" resulting from liquefied natural gas exports would have on "domestic natural gas supply, demand and market prices." Export Study 20-21 (Appendix A), JA0543-0544. The Export Study demands no inference or extrapolation to forecast those impacts: it expressly concludes that "[i]ncreased natural gas exports lead to higher domestic natural gas prices, increased domestic natural gas production," and

---

[12] The Freeport terminal's owners continue to publicly assert that the terminal's construction will foreseeably result in additional natural gas production: "[T]he plant *will* create thousands of jobs related to the production of the natural gas that will supply the liquefaction project." *Freeport LNG's Liquefaction and Export Project*, Freeport LNG, http://www.freeportlng.com/Liquefaction_Project.asp (last visited June 26, 2015) (providing specific financial range for likely investment in the "increase in natural gas production" that will result from terminal) (emphasis added).

"reduced domestic natural gas consumption," primarily resulting in "shifts to coal-fired generation." Export Study 6, JA0529.

The Study addresses the variables that could affect those conclusions, providing a detailed framework for understanding and applying its analysis. Where an agency takes actions that will transform the national market for natural gas, the Study's explanation of resulting "national trends" is entirely appropriate. Freeport 18.[13] The Commission may need to conduct additional analysis, in order to assess the impacts of its decision; that does not render the Study devoid of "meaningful information," or – most importantly – allow the Commission to conclude that its action would have no foreseeable effects on natural gas production and use. Freeport 28.

The Freeport intervenors argue that the "*worldwide* environmental effects" of climate change make the Freeport terminal's contribution to

---

[13] *Coliseum Square Association v. Jackson*, cited by the Freeport intervenors, does not address comparable circumstances. 465 F.3d 215 (5th Cir. 2006). In *Jackson*, the record contained "nothing concrete to suggest" that the detrimental effects in question would occur; it contained only "broad statistical data" that was not directed at the decision under review. *Id.* at 238. The Fifth Circuit did not hold that "statistical data" was irrelevant, but rather found that the record there did not permit an inference from that particular "broad" analysis to the narrow question before it. *Id.*

such change "inherently unknowable." Freeport 30 (even as they assert the need for "source locational information," *id.* at 27). But "the fact that 'climate change is largely a global phenomenon that includes actions that are outside of [the agency's] control … does not release the agency from the [NEPA] duty of assessing the effects of *its* actions on global warming within the context of other actions that also affect global warming.'" *Center for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,* 538 F.3d 1172, 1217 (9th Cir. 2008) (omission and alteration in original with exception of addition of NEPA, internal citation omitted). Climate change can be – and routinely is – analyzed under NEPA, despite its global nature.[14]

---

[14] The Council of Environmental Quality has explained that even though "climate change is a global problem," and "there are more sources and actions emitting [greenhouse gases] … than are typically encountered" when assessing air pollution, NEPA analysis can "reflect this global context" while also "ensuring that useful information is provided to decision makers." Memorandum for Heads of Federal Departments & Agencies from Nancy H. Sutley at 2 (Feb. 18, 2010) *available at* http://energy.gov/sites/prod/files/CEQ_Draft_Guidance-ClimateChangeandGHGemissions-2.18.10.pdf. The recent revision to this draft reiterates the need to consider greenhouse gases in NEPA reviews notwithstanding the fact that individual projects' emissions "represent only a small fraction of global emissions." Council on Environmental Quality, Revised Draft Guidance on Greenhouse Gas Emissions in NEPA Reviews, 79 Fed. Reg. 77,802, 77,825 (Dec. 24, 2014).

Agencies fulfill that responsibility by adopting reasonable (and generally available) estimates of the 'baseline' emissions that would occur absent its actions, and quantifying the change that would result from its decision. This is not an impossible task; the Energy Information Administration's Export Study undertakes one aspect of it, estimating exports' effects on greenhouse-gas emissions of domestic energy consumers. Export Study 19, JA0542.[15] *See also* August Addendum 4-7 (demonstrating how methane emissions from export-induced natural gas production may be estimated).

## C. The Commission Could Not Lawfully Ignore Changes in the Use of Gas and Coal Resulting from Increased Exports.

The Commission defends its refusal to consider the increased use of coal that will result from increased natural gas exports by asserting the same "reasons" as it offers to defend its exclusion of export-induced natural gas production. Response 43-44. Among the primary 'reasons' FERC cites for ignoring export-induced gas production, however, is the possibility that the exported gas will be supplied by "existing production," Response 35 – that is, natural gas currently being used to

---

[15] The Energy Information Administration addresses only the effects of increased coal-burning at U.S. power plants; it does not address methane emissions resulting from increased natural gas production.

fuel generators in the United States, who would then need to "switch" to other fuels, such as coal. Export Study 18, JA0541. In other words, the Commission first claims (albeit with no basis in the administrative record) that adding billions of cubic feet per day of export-related demand may not affect the production of natural gas, because these exports could come from "existing supplies." Response 36. Yet when asked to examine the effects of re-directing those 'existing supplies' away from the domestic market the Commission again refuses, deriding that possibility as "speculation upon speculation." Response 44. This is a shell game in which the Commission has pocketed the pea.

The Freeport facility intends to export nearly 2 billion cubic feet of natural gas each day; cumulatively with other export-facility applications pending before (or authorized by) the Commission, the resulting exports will increase demand for natural gas by 19%. Export Study, Table B5, JA0556. *See* Opening 13 n.7. That exported gas has to come from *somewhere* – either new supply (necessitating additional gas production) or gas currently being consumed in the United States (requiring consumers to switch to coal and other substitutes). The administrative record indicates that most ("60 to 70 percent") of the gas

needed to satisfy export-produced demand will come from new production, while most of the remainder will be supplied by fuel-switching to coal. Export Study 6, Application 3, 14, JA0529, 0132, 0143. The Commission should, accordingly, have included each effect in its environmental impact statement; but in any event, it could not lawfully exclude both.[16]

III.   THE COMMISSION WAS REQUIRED TO ASSESS THE CUMULATIVE IMPACTS OF OTHER EXPORT AUTHORIZATIONS

The Commission asserts that its environmental impact statement could ignore the effects of the other export facilities that it has authorized, or is poised to authorize, because it was required only to consider cumulative impacts "*in the same geographic area*" as the Freeport facility. Response 44 (citing *TOMAC, Taxpayers of Michigan v. Norton,* 433 F.3d 852, 864 (D.C. Cir. 2006) (emphasis added by Respondent)). NEPA, however, requires FERC to first properly identify "the area in which the effects of the proposed project will be felt."

---

[16] The Energy Information Administration's Export Study refutes respondents' assertion that the Commission could not feasibly assess the impacts of exports on domestic use of gas, coal, and other fuels. Freeport 28-29. Using well-established models, the Study includes estimates of changes in coal and gas use, under a variety of different scenarios, and estimates some of the air quality impacts of those changes. Export Study 17-19, Appendix B, JA0540-0542, 0551-0558.

*TOMAC,* 433 F.3d at 864. As set forth above, the Commission failed to do so here, by ignoring impacts on natural gas production, and on the use of gas and coal by domestic power plants.

Given those impacts, the Commission was also required to consider its "past, present, and reasonably foreseeable future actions" that will also affect such production and use. *Id.* The other export facilities seeking the Commission's approval are among these actions; they will affect the price, production and use of natural gas, with impacts in areas where natural gas is produced, and where it is used. The Commission consequently erred by refusing, when it approved the Freeport terminal, to consider the cumulative effects of those other projects on the price, production, and use of natural gas. *See Delaware Riverkeeper Network v. FERC,* 753 F.3d 1304, 1319-20 (D.C. Cir. 2014).[17]

_____

[17] The Commission mischaracterizes Sierra Club's argument as a claim that the other projects are 'connected actions,' a separate category under NEPA. Response 47. The various export approvals are not different parts of a connected, larger action, 40 C.F.R. § 1508.25(a)(1)(iii); they are distinct actions, with significant, cumulative effects on the price, production and use of natural gas in the United States, 40 C.F.R. § 1508.7.

IV.  THE COMMISSION FAILED TO ADEQUATELY DISCLOSE INDIRECT AIR
POLLUTION FROM ELECTRICITY CONSUMPTION

The Commission's impact statement describes, as the Freeport

Project's air quality impacts, a total comprising emissions of various air

pollutants from the Project itself, and from the ships needed for gas

transport. EIS 4-211, 4-219, JA0949, 0957. But the facility will also

require an enormous quantity of electricity – 600 to 700 megawatts, at

all times (roughly equivalent to the output of an entire power plant).

EIS 1-15, JA0693. This electricity will be provided through the grid that

services the remainder of the area, primarily from fossil-fuel-fired

power plants, producing substantial additional pollution. The

Commission failed to disclose that pollution in its impact statement.

Comments on Draft Environmental Impact Statement for Freeport

LNG Liquefaction Project, 17-19 (May 5, 2014) ("Sierra Club

Comments"), JA0431-0433.

The Commission responds that the Sierra Club's comments did not

raise this issue, Response 49; but they did, Sierra Club Comments 17-

19, JA0431-0433 (specifically noting draft statement's failure to "assess

likely emissions associated with increased demand for electricity").

FERC further asserts that a table in an appendix to its impact

statement adequately disclosed the relevant impacts. Response 51. But that table was offered only as a comparison between the "hypothetical use of combustion turbines," and "proposed electric motor drives." EIS App F-7, JA1045. The Commission offered no explanation that would allow the public to understand that the figures from that comparison needed to multiplied (to translate the table's rates into total emissions), and added to the air impacts noted in the environmental impact statement, in order to understand the facility's total impact. The Commission consequently failed to meet its obligations under NEPA. *See North Carolina Wildlife Fed'n v. North Carolina Dep't of Transp.,* 677 F.3d 596, 603 (4th Cir. 2012) (noting that "NEPA procedures emphasize clarity and transparency of process").

## CONCLUSION

For the reasons set forth above, petitioners request that the Commission's order be vacated and remanded to the Agency.

Respectfully submitted this 17th day of July, 2015:

*s/ Nathan Matthews*
Sanjay Narayan
Nathan Matthews
Sierra Club Environmental Law Program
85 2nd Street, Second Floor
San Francisco, CA 94105

(415) 977-5695
nathan.matthews@sierraclub.org
*Counsel for Petitioners Sierra Club and*
*Galveston Baykeeper*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION

Counsel hereby certifies that, in accordance with Federal Rule of

Appellate Procedure 32(a)(7)(C), the foregoing Final Reply Brief of

Petitioner Sierra Club contains 6,973 words, as counted by counsel's

Microsoft Word processing program.


Dated: July 17, 2015.

*s/ Nathan Matthews*
Sanjay Narayan
Nathan Matthews
Sierra Club Environmental Law Program
85 2nd Street, Second Floor
San Francisco, CA 94105
(415) 977-5695
nathan.matthews@sierraclub.org
*Counsel for Petitioners Sierra Club and*
*Galveston Baykeeper*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of July, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

*/s/ Nathan Matthews*
Nathan Matthews

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

**Regulations:**

40 C.F.R. § 1501.7…………………………………………..……..…A-1

40 C.F.R. § 1502.14…………………………………………………A-3

40 C.F.R. § 1502.22…………………………………………....A-4

40 C.F.R. § 1504.3…………………………………………………A-5

USCA Case #14-1275          Document #1563125          Filed: 07/17/2015          Page 50 of 56

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
      Part 1501. Nepa and Agency Planning (Refs & Annos)

40 C.F.R. § 1501.7

§ 1501.7 Scoping.

Currentness

There shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action. This process shall be termed scoping. As soon as practicable after its decision to prepare an environmental impact statement and before the scoping process the lead agency shall publish a notice of intent (§ 1508.22) in the Federal Register except as provided in § 1507.3(e).

(a) As part of the scoping process the lead agency shall:

(1) Invite the participation of affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, and other interested persons (including those who might not be in accord with the action on environmental grounds), unless there is a limited exception under § 1507.3(c). An agency may give notice in accordance with § 1506.6.

(2) Determine the scope (§ 1508.25) and the significant issues to be analyzed in depth in the environmental impact statement.

(3) Identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review (§ 1506.3), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.

(4) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.

(5) Indicate any public environmental assessments and other environmental impact statements which are being or will be prepared that are related to but are not part of the scope of the impact statement under consideration.

(6) Identify other environmental review and consultation requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently with, and integrated with, the environmental impact statement as provided in § 1502.25.

(7) Indicate the relationship between the timing of the preparation of environmental analyses and the agency's tentative planning and decisionmaking schedule.

(b) As part of the scoping process the lead agency may:

A-1

USCA Case #14-1275 Document #1563125 Filed: 07/17/2015 Page 51 of 56

(1) Set page limits on environmental documents (§ 1502.7).

(2) Set time limits (§ 1501.8).

(3) Adopt procedures under § 1507.3 to combine its environmental assessment process with its scoping process.

(4) Hold an early scoping meeting or meetings which may be integrated with any other early planning meeting the agency has. Such a scoping meeting will often be appropriate when the impacts of a particular action are confined to specific sites.

(c) An agency shall revise the determinations made under paragraphs (a) and (b) of this section if substantial changes are made later in the proposed action, or if significant new circumstances or information arise which bear on the proposal or its impacts.

SOURCE: 43 FR 55992, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609, and Executive Order 11514, Mar. 5, 1970, as amended by Executive Order 11991, May 24, 1977).

## Notes of Decisions (24)

Current through June 25, 2015; 80 FR 36688.

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

A-2

Code of Federal Regulations
Title 40. Protection of Environment
Chapter V. Council on Environmental Quality
Part 1502. Environmental Impact Statement (Refs & Annos)

40 C.F.R. § 1502.14

# § 1502.14 Alternatives including the proposed action.

Currentness

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives. SOURCE: 43 FR 55994, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), andExecutive Order 11514 (Mar. 5, 1970, as amended by Executive Order 11991, May 24, 1977).

## Notes of Decisions (1384)

Current through June 25, 2015; 80 FR 36688.

---

**End of Document**              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

A-3

Code of Federal Regulations
Title 40. Protection of Environment
Chapter V. Council on Environmental Quality
Part 1502. Environmental Impact Statement (Refs & Annos)

40 C.F.R. § 1502.22

§ 1502.22 Incomplete or unavailable information.

Currency

When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

(c) The amended regulation will be applicable to all environmental impact statements for which a Notice of Intent (40 CFR 1508.22) is published in the Federal Register on or after May 27, 1986. For environmental impact statements in progress, agencies may choose to comply with the requirements of either the original or amended regulation.

**Credits**

[51 FR 15625, April 25, 1986]

SOURCE: 43 FR 55994, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514 (Mar. 5, 1970, as amended by Executive Order 11991, May 24, 1977).

A-4

USCA Case #14-1275      Document #1563125          Filed: 07/17/2015      Page 54 of 56

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
      Part 1504. Predecision Referrals to the Council of Proposed Federal Actions
      Determined to be Environmentally Unsatisfactory (Refs & Annos)

40 C.F.R. § 1504.3

# § 1504.3 Procedure for referrals and response.

Currentness

(a) A Federal agency making the referral to the Council shall:

(1) Advise the lead agency at the earliest possible time that it intends to refer a matter to the Council unless a satisfactory agreement is reached.

(2) Include such advice in the referring agency's comments on the draft environmental impact statement, except when the statement does not contain adequate information to permit an assessment of the matter's environmental acceptability.

(3) Identify any essential information that is lacking and request that it be made available at the earliest possible time.

(4) Send copies of such advice to the Council.

(b) The referring agency shall deliver its referral to the Council not later than twenty-five (25) days after the final environmental impact statement has been made available to the Environmental Protection Agency, commenting agencies, and the public. Except when an extension of this period has been granted by the lead agency, the Council will not accept a referral after that date.

(c) The referral shall consist of:

(1) A copy of the letter signed by the head of the referring agency and delivered to the lead agency informing the lead agency of the referral and the reasons for it, and requesting that no action be taken to implement the matter until the Council acts upon the referral. The letter shall include a copy of the statement referred to in (c)(2) of this section.

(2) A statement supported by factual evidence leading to the conclusion that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality. The statement shall:

(i) Identify any material facts in controversy and incorporate (by reference if appropriate) agreed upon facts,

(ii) Identify any existing environmental requirements or policies which would be violated by the matter,

(iii) Present the reasons why the referring agency believes the matter is environmentally unsatisfactory,

A-5

USCA Case #14-1275        Document #1563125        Filed: 07/17/2015        Page 55 of 56

(iv) Contain a finding by the agency whether the issue raised is of national importance because of the threat to national environmental resources or policies or for some other reason,

(v) Review the steps taken by the referring agency to bring its concerns to the attention of the lead agency at the earliest possible time, and

(vi) Give the referring agency's recommendations as to what mitigation alternative, further study, or other course of action (including abandonment of the matter) are necessary to remedy the situation.

(d) Not later than twenty-five (25) days after the referral to the Council the lead agency may deliver a response to the Council, and the referring agency. If the lead agency requests more time and gives assurance that the matter will not go forward in the interim, the Council may grant an extension. The response shall:

(1) Address fully the issues raised in the referral.

(2) Be supported by evidence.

(3) Give the lead agency's response to the referring agency's recommendations.

(e) Interested persons (including the applicant) may deliver their views in writing to the Council. Views in support of the referral should be delivered not later than the referral. Views in support of the response shall be delivered not later than the response.

(f) Not later than twenty-five (25) days after receipt of both the referral and any response or upon being informed that there will be no response (unless the lead agency agrees to a longer time), the Council may take one or more of the following actions:

(1) Conclude that the process of referral and response has successfully resolved the problem.

(2) Initiate discussions with the agencies with the objective of mediation with referring and lead agencies.

(3) Hold public meetings or hearings to obtain additional views and information.

(4) Determine that the issue is not one of national importance and request the referring and lead agencies to pursue their decision process.

(5) Determine that the issue should be further negotiated by the referring and lead agencies and is not appropriate for Council consideration until one or more heads of agencies report to the Council that the agencies' disagreements are irreconcilable.

(6) Publish its findings and recommendations (including where appropriate a finding that the submitted evidence does not support the position of an agency).

(7) When appropriate, submit the referral and the response together with the Council's recommendation to the President for action.

(g) The Council shall take no longer than 60 days to complete the actions specified in paragraph (f)(2), (3), or (5) of this section.

(h) When the referral involves an action required by statute to be determined on the record after opportunity

A-6

USGA Case #14-1275    Document #1563125    Filed: 07/17/2015    Page 56 of 56

for agency hearing, the referral shall be conducted in a manner consistent with 5 U.S.C. 557(b) (Administrative Procedure Act).

## Credits

[43 FR 55998, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]
SOURCE: 43 FR 55998, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514 (Mar. 5, 1970, as amended by Executive Order 11991, May 24, 1977).

Current through June 25, 2015; 80 FR 36688.

---

**End of Document**          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

A-7