ORAL ARGUMENT HELD ON NOVEMBER 13, 2015

March 17, 2016

*Via Electronic Case Filing*
Mark Langer, Clerk
U.S. Court of Appeals for the District of Columbia Circuit
E. Barrett Prettyman United States Courthouse
333 Constitution Ave., N.W., Room 5205
Washington, D.C. 20001

Re:   *Sierra Club, et al., v. FERC,* No. 14-1275

Dear Mr. Langer:

Pursuant to F.R.A.P. 28(j), Petitioners Sierra Club and Galveston Baykeeper submit the attached FERC order as supplemental authority.

On March 11, 2016, FERC denied an application to construct and operate a liquefied natural gas export facility and associated pipeline in Oregon. Jordan Cove Energy Project, L.P., 154 FERC ¶ 61,190 (Mar. 11, 2016). As in this case, there, applicants sought authorization for the proposed export facility under section 3 of the Natural Gas Act. *Id.* P1. The related pipeline sought authorization under section 7(c). *Id.* FERC conducted an independent review of whether the two projects were consistent with the public interest, and concluded that they were not. *Id.* PP34, 38-41, 45-46.

FERC recognized that the Department of Energy has already conditionally authorized exports from the proposed Jordan Cove facility, thereby finding that these exports would be consistent with the public interest. *Id.* P40. FERC explained that FERC had independent

authority, and an independent obligation, to evaluate impacts on the public interest. *Id.* P40 n.46. FERC's denial demonstrates FERC's recognition that the Department of Energy's authorization of exports does not deprive FERC of authority to deny approval of infrastructure necessary to carry out those exports. *See* Petitioners' Reply Brief at 13-14.

Respectfully submitted,

/s/ Nathan Matthews
Nathan Matthews
85 2nd St., Second Floor
San Francisco, CA 94105
(415) 977-5695
nathan.matthews@sierraclub.org
*Counsel for Petitioners Sierra*
*Club and Galveston Baykeeper*

cc: Counsel of Record (via ECF)

154 FERC ¶ 61,190
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Norman C. Bay, Chairman;
Cheryl A. LaFleur, Tony Clark,
and Colette D. Honorable.


Jordan Cove Energy Project, L.P.                    Docket No.  CP13-483-000

Pacific Connector Gas Pipeline, LP                  Docket No.  CP13-492-000


ORDER DENYING APPLICATIONS FOR CERTIFICATE AND
SECTION 3 AUTHORIZATION

(Issued March 11, 2016)

1.      On May 21, 2013, in Docket No. CP13-483-000, Jordan Cove Energy Project, L.P. (Jordan Cove) filed an application under section 3 of the Natural Gas Act (NGA) and Parts 153 and 380 of the Commission's regulations to site, construct, and operate a liquefied natural gas (LNG) export terminal and associated facilities (Jordan Cove LNG Terminal or LNG Terminal) on the North Spit of Coos Bay in Coos County, Oregon.

2.      On June 6, 2013, in Docket No. CP13-492-000, Pacific Connector Gas Pipeline, LP (Pacific Connector) filed an application under NGA section 7(c) and Part 157 of the Commission's regulations for a certificate of public convenience and necessity to construct and operate an approximately 232-mile-long, 36-inch-diameter interstate natural gas pipeline originating near Malin, in Klamath County, Oregon, and terminating at the Jordan Cove LNG Terminal (Pacific Connector Pipeline).  The Pacific Connector Pipeline will transport natural gas to the Jordan Cove LNG Terminal for processing, liquefaction, and export.  Pacific Connector also requests a blanket certificate under subpart F of Part 157 of the Commission's regulations to perform certain routine construction, operation, and abandonment activities, as well as a blanket certificate under subpart G of Part 284 of the Commission's regulations to provide open-access transportation services.

3.      As discussed below, the Commission denies Pacific Connector's and Jordan Cove's proposals.

Docket Nos. CP13-483-000 and CP13-492-000                                    - 2 -

## I.    Background

4.      Jordan Cove and Pacific Connector are Delaware limited partnerships.  Jordan Cove is authorized to do business in the State of Oregon, and has one general partner, the Jordan Cove Energy Project, L.L.C., and one limited partner, Jordan Cove LNG L.P. (a Delaware limited partnership that owns 100 percent of Jordan Cove and Jordan Cove Energy Project, L.L.C.).[1]  Pacific Connector is authorized to do business in the states of Oregon, California, and Utah.  Pacific Connector has one general partner, Pacific Connector Gas Pipeline, LLC (who owns a one percent interest)[2] and two limited partners, Williams Gas Pipeline Company, LLC[3] and Jordan Cove LNG L.P. (who each own a 49.5 percent interest).

5.      Jordan Cove and Pacific Connector are new companies.  Upon construction and operation of their proposed facilities, Jordan Cove and Pacific Connector would be subject to the Commission's jurisdiction under the NGA.

## II.    Proposals

6.      The applicants designed the Jordan Cove LNG Terminal and the Pacific Connector Pipeline Projects (referred to collectively as "the projects") to enable the production of up to 6.8 million metric tons per annum (MMTPA) of LNG, using a feed of approximately 1.04 billion standard cubic feet per day (Bcf/d) of natural gas, for export to international or domestic markets in the non-contiguous United States.[4]

---

[1] Jordan Cove LNG L.P. is wholly owned and controlled by Veresen Inc., an Alberta, Canada Corporation.  *See* Jordan Cove's October 8, 2015 filing at 6 and Exhibit B.

[2] Pacific Connector Gas Pipeline, LLC is a Delaware limited liability company equally owned by Williams Gas Pipeline Company, LLC and Jordan Cove LNG L.P.  *See* Jordan Cove's April 23, 2014 filing stating that Fort Chicago LNG II U.S. L.P. (listed in Pacific Connector's application as a part owner of the Pacific Connector Gas Pipeline, LLC) changed its name to Jordan Cove LNG L.P.

[3] Williams Pacific Gas Pipeline Company, LLC is a wholly-owned subsidiary of The Williams Companies, Inc.

[4] We note that while Jordan Cove asserted in its application that there is a need for its project to serve current and future *domestic* needs, stating "the Project will be able to provide access to LNG to meet the demand of isolated markets in Hawaii . . . and the Cook Inlet region of Alaska," Jordan Cove has not filed an application for a certificate of

(continued…)

Docket Nos. CP13-483-000 and CP13-492-000                                - 3 -

7.      The Pacific Connector Pipeline would carry natural gas to the Jordan Cove LNG Terminal, where the natural gas will be liquefied, stored in cryogenic tanks, and loaded onto ocean-going vessels.  The applicants state that the projects will enable natural gas produced in western Canada and the United States' Rocky Mountains to serve markets in Asia, southern Oregon, and, potentially, Hawaii and Alaska.[5]

## A.      The Jordan Cove LNG Terminal Proposal in Docket No. CP13-483-000

8.      Jordan Cove seeks authorization under NGA section 3 to site, construct, and operate an LNG export terminal that would consist of:

- a natural gas conditioning facility with a combined natural gas throughput of approximately 1 Bcf/d;

- four natural gas liquefaction trains that would each process approximately 1.5 MMTPA of LNG;

- a refrigerant storage and resupply system;

- an aerial cooling system;

- two full-containment LNG storage tanks, each with a capacity of 160,000 cubic meters ($m^3$) (or 1,006,000 barrels), and each equipped with three fully submerged LNG in-tank pumps sized for approximately 11,600 gallons per minute;

- an LNG transfer line consisting of one 2,300-foot-long, 36-inch-diameter line that would connect the shore-based storage system with the LNG loading system;

- an LNG carrier cargo loading system consisting of three 16-inch loading arms and one 16-inch vapor return arm;

- a LNG carrier loading berth capable of accommodating LNG carriers with capacities from 148,000 $m^3$ to 217,000 $m^3$;

---

public convenience and necessity authorizing it to transport or sell for resale gas in *interstate* commerce.  The section 3 authorization it has requested extends only to operations in *foreign* commerce.

[5] *See id.*  Jordan Cove would need to apply for and receive authorization under section 7(c) of the NGA prior to processing any gas for transportation in interstate commerce.

Docket Nos. CP13-483-000 and CP13-492-000                                   - 4 -

- a utility corridor to serve as the primary roadway and utility interconnection between the LNG terminal and the South Dunes Power Plant;

- a boil off gas recovery system;

- electrical, nitrogen, fuel gas, lighting, instrument/plant air and water facility systems;

- an LNG spill containment system, fire water system and other hazard detection, control and prevention systems; and

- utilities, buildings, and support facilities.

9.     The Jordan Cove LNG Terminal will be located within about 400 acres of open and industrial land across two contiguous parcels (an eastern and western parcel).[6]  The parcels are located on the bay side of the North Spit of Coos Bay in unincorporated Coos County, Oregon, north of the towns of North Bend and Coos Bay.

### B.    Pacific Connector Gas Pipeline

#### 1.    Facilities

10.    Pacific Connector requests authorization under NGA section 7(c) to construct and operate a new 232-mile-long interstate natural gas transmission system designed to deliver up to 1.06 Bcf/d of natural gas from interconnects with Ruby Pipeline LLC (Ruby) and Gas Transmission Northwest LLC (GTN) near Malin, Oregon, to the Jordan Cove LNG Terminal.  In addition to delivering natural gas to the LNG terminal, Pacific Connector states its pipeline would provide deliveries in southern Oregon through an interconnection with Northwest Pipeline GP's (Northwest) Grants Pass Lateral.[7]  The proposed Pacific Connector Pipeline would consist of the following facilities:

- approximately 232 miles of 36-inch-diameter pipeline and appurtenant facilities[8] traversing Klamath, Jackson, Douglas, and Coos counties, Oregon;

---

[6] The two parcels are owned by Jordan Cove.

[7] Northwest's Grants Pass Lateral is a 131-mile-long pipeline system extending from Eugene to Grants Pass, Oregon.

[8] Appurtenant facilities include five pig launchers and receivers and 17 block valves spaced along the pipeline route in compliance with U.S. Department of Transportation regulations.

Docket Nos. CP13-483-000 and CP13-492-000                                    - 5 -

- a natural gas compressor station (Klamath Compressor Station), located on a 31-acre site in Klamath County, Oregon, containing three 20,500 horsepower (HP) compressor units[9] for a total of 41,000 HP of compression;

- appurtenant facilities, including a compressor building, suction/discharge piping, and final discharge coolers, a mainline block valve, and a pig launcher assembly;[10]

- the Jordan Cove Delivery Meter Station, that would have a capacity of approximately 1.020 Bcf/d of natural gas at 850 psig, located at the terminus of the Pacific Connector Pipeline at milepost (MP) 1.47, consisting of multiple large ultrasonic gas flow meters, a gas chromatograph, two gas filter/separators, flow control, electronic flow measurement, communications equipment, a building to house the equipment, a mainline block valve, and a pig receiver;[11]

- the Clarks Branch Delivery Meter Station, with a maximum design capacity of approximately 40 million cubic feet per day (MMcf/d) at 900 psig located at an interconnect with Northwest's existing Grant's Pass Lateral at MP 71.46 in Douglas County, Oregon, consisting of an 8-inch ultrasonic gas flow meter, a gas chromatograph, gas separator, flow control, overpressure protection, electronic flow measurement, communications equipment, a building to house the equipment, a mainline block valve, a pig launcher assembly, and a pig receiver assembly;

- the Klamath-Beaver Receipt Meter Station, with a maximum design capacity of approximately 1.06 Bcf/d at 900 psig located at an interconnect with GTN's mainline in Klamath County, Oregon, within the Klamath Compressor Station site, consisting of multiple large-diameter ultrasonic gas flow meters, gas piping and valves, gas chromatograph, flow control, electronic flow measurement, communications for voice and data transfer, and a building to house the equipment;

---

[9] The third 20,500 HP compressor unit is proposed for standby purposes; only two units will operate at any given time.

[10] A pig is a tool for cleaning and inspecting the inside of a pipeline.

[11] Pacific Connector states that it would enter into an operational balancing agreement with Jordan Cove prior to the in-service date of these facilities.

Docket Nos. CP13-483-000 and CP13-492-000                                    - 6 -

- the Klamath-Eagle Receipt Meter Station, with a maximum design capacity of approximately 1.06 Bcf/d at 900 psig located at an interconnect with Ruby's mainline in Klamath County, Oregon, on the Klamath Compressor Station site, consisting of multiple large-diameter ultrasonic gas flow meters, gas piping and valves, gas chromatograph, flow control, electronic flow measurement, communications for voice and data transfer, and a building to house the equipment;[12] and

- communications towers installed at each meter station and at the Klamath Compressor Station to connect Pacific Connector's system to Northwest's existing backbone microwave system, which provides communications with Northwest's gas control center.  Additionally, Pacific Connector would utilize Northwest's existing Harness Mountain communications site in Douglas, County, Oregon and would lease space on seven other existing communication towers in Coos, Douglas, Jackson, and Klamath counties, Oregon.

11.    Pacific Connector states that the initial firm design capacity of its proposed pipeline system is 1.06 Bcf/d and the maximum allowable operating pressure (MAOP) for the pipeline would be 1,480 psig.  Pacific Connector explains that the design assumes 40 MMcf/d would be reserved for the Clark's Branch Delivery Meter Station and 1.02 Bcf/d would be reserved for the Jordan Cove Delivery Meter Station at the terminus of the Pacific Connector Pipeline.  Pacific Connector estimates that the cost of the Pacific Connector Pipeline is approximately $1.74 billion.[13]

## 2.    Request for Blanket Certificates

12.    Pacific Connector requests a blanket certificate under subpart F of Part 157 to perform routine construction, maintenance, and operational activities related to its proposals.  Pacific Connector also requests a blanket certificate under subpart G of Part 284 to provide open-access firm and interruptible transportation services for its customers.

---

[12] Pacific Connector states that it would provide contributions-in-aid-of-construction for Northwest's, GTN's, and Ruby's construction of the interconnect facilities and would enter into an operational balancing agreement with each company prior to the in-service date of the respective facilities.

[13] The cost estimate is in "as spent" dollars based on a November 1, 2017 in-service date.

Docket Nos. CP13-483-000 and CP13-492-000                                  - 7 -

### 3. <u>Markets and Services</u>

13.     Pacific Connector states that it proposes the Pacific Connector Pipeline, which it has characterized as an integral component of the Jordan Cove LNG Terminal,[14] in response to rising international demand for United States' and Canadian natural gas supplies.  Pacific Connector explains that its pipeline will provide market outlets to transport western Canadian and United States' Rocky Mountain natural gas supplies for export through the Jordan Cove LNG Terminal.  Pacific Connector states that the pipeline also will be capable of delivering gas to markets in southern Oregon through an interconnection with Northwest's Grants Pass Lateral, but that these markets alone are not sufficient to drive the investment in the pipeline.[15]  Therefore, Pacific Connector states that if the pipeline's capacity is not substantially subscribed and if the Jordan Cove LNG Terminal is not contracted, it will not build the pipeline.[16]

14.     Pacific Connector has not conducted an open season for its proposed transportation capacity, and has not submitted any precedent agreements or contracts with, or subsequent to, the filing of its application.  In its application, Pacific Connector stated that it would keep the Commission apprised of its plans to conduct an open season and enter into precedent agreements for the pipeline's capacity.

15.     On May 7, 2014, Commission staff sent Pacific Connector a data request asking it to provide the current status of:  (1) Jordan Cove's negotiations for liquefaction contracts for the Jordan Cove LNG Terminal; and (2) Pacific Connector's actions to conduct an open season and enter into precedent agreements for pipeline capacity.  On May 15, 2014, Pacific Connector responded and stated that Jordan Cove had entered into non-binding Heads of Agreements with various Asian companies for liquefaction and transportation capacity.  Pacific Connector stated that the Heads of Agreements generally provided for pipeline precedent agreements to be executed by October 2014, upon which it would conduct an open season (in October/November 2014).

16.     On December 5, 2014, Commission staff sent Pacific Connector another data request asking Pacific Connector to update the Commission on the results of its October/November 2014 open season.  On December 10, 2014, Pacific Connector responded, stating that Jordan Cove was still negotiating under the non-binding Heads of Agreements, the terms of which had been extended into early 2015.  Pacific Connector

---

[14] Pacific Connector's June 1, 2015 Data Response at 2.

[15] Pacific Connector's Application at 7.

[16] *Id*. at 9.  *See also* Pacific Connector's June 1, 2015 Data Response at 2.

explained that the extended Heads of Agreements generally provided for pipeline precedent agreements to be executed by those shippers choosing to make binding commitments by the first or second quarter of 2015, and that it anticipated holding an open season upon execution of those agreements, in the second quarter of 2015.

17.     On May 20, 2015, Commission staff sent Pacific Connector a third data request, explaining that the Commission's Certificate Policy Statement requires the Commission to balance the public benefits of a pipeline proposal against its potential adverse impacts, and that Pacific Connector must show that the public benefits of its proposal outweigh the project's adverse impacts.  The data request further explained that while the Commission no longer requires an applicant to present contracts for any specific percentage of proposed new capacity, contracts or precedent agreements always serve as important evidence of project demand.  Commission staff then asked Pacific Connector to identify the date it held or will hold an open season and, in the event it does not enter into agreements for service prior to the time the Commission has completed its review of the applications, what evidence in the record Pacific Connector is relying on to show that the benefits of the project outweigh the potential adverse impacts.  On June 1, 2015, Pacific Connector responded, stating that would not hold an open season in the second quarter of 2015, but would do so upon the execution of pipeline precedent agreements for at least 90 percent of the pipeline's design capacity, which it anticipated would happen by the end of 2015.  Further, Pacific Connector stated that if Jordan Cove does not execute liquefaction agreements for the LNG terminal's capacity, transportation service agreements for service on Pacific Connector will not be executed and it will not build the pipeline.  Finally, Pacific Connector stated that the U.S. Department of Energy (DOE) had authorized Jordan Cove's export of LNG to free trade agreement and non-free trade agreement nations, consistent with the public interest.  Thus, because the Pacific Connector Pipeline is an integral component of the Jordan Cove LNG Terminal, the pipeline's "public benefits encompass all the public benefits of the Jordan Cove [T]erminal."[17]

18.     Finally, on October 14, 2015, Commission staff sent Pacific Connector a fourth data request asking Pacific Connector to discuss:  (1) the negotiations between Jordan Cove, Pacific Connector, and any potential liquefaction and transportation customers; (2) whether Pacific Connector entered into any commitments for firm service on the pipeline; and (3) if Pacific Connector entered into precedent agreements, when did or when will it conduct an open season.  On November 4, 2015, Pacific Connector replied stating that negotiations between Jordan Cove, Pacific Connector, and prospective customers are "active and ongoing."  Pacific Connector stated it "remains confident that

---

[17] Pacific Connector's June 1, 2015 Data Response at 2.

these customers will enter into binding long-term [agreements]" with both Jordan Cove and Pacific Connector. Pacific Connector again emphasized that given "the significant capital costs associated with this project, Pacific Connector and Jordan Cove must have committed customers with executed agreements in place before making the ultimate decision to move forward on construction of the project" and pledged that it "will adhere to the [C]ommission's standard … condition that service agreements for the pipeline be executed prior to the commencement of construction."[18] Pacific Connector did not provide an estimated date that agreements would be finalized. Pacific Connector also provided information indicating that it had obtained easements for only 5 percent and 3 percent, respectively, of its necessary permanent and construction right of way.

## III.    Procedural Matters

### A.    Notice, Interventions, Comments, and Protests

19.    Notice of Jordan Cove's application was published in the *Federal Register* on June 6, 2013 (78 Fed. Reg. 34,089), establishing June 20, 2013, as the due date for filing motions to intervene and protests. The parties listed in Appendix A filed timely, unopposed motions to intervene in Docket No. CP13-483-000.[19] Timely notices of intervention in Docket No. CP13-483-000 were filed by the National Marine Fisheries Service (NMFS) and jointly by the Oregon Department of Environmental Quality (Oregon DEQ) and the Oregon Department of Fish and Wildlife (Oregon DFW).[20]

---

[18] Pacific Connector's November 4, 2015 Data Response at 1.

[19] Timely, unopposed motions to intervene are granted by operation of Rule 214 of the Commission's Rules of Practice and Procedure. *See* 18 C.F.R. § 385.214 (2015).

[20] The timely notices of intervention filed by NMFS and Oregon DEQ and Oregon DFW are granted by operation of Rule 214(a)(2) of the Commission's Rules of Practice and Procedure and are listed as parties in Appendix A. 18 C.F.R. § 385.214(a)(2) (2015). On June 20, 2013, Landowners United and Clarence Adams, jointly, filed a pleading titled "Notice of Intervention" in Docket No. CP13-483-000. Notices of Intervention may only be filed by a State Commission; the Advisory Council on Historic Preservation; the U.S. Departments of Agriculture, Commerce, and the Interior; any state fish and wildlife, water quality certification, or water rights agency; or Indian tribe with authority to issue a water quality certification. 18 C.F.R. § 385.214(a)(2) (2015). However, Landowners United's and Clarence Adams' pleading was timely filed and satisfied all of Rule 214's requirements for filing a motion to intervene. Accordingly, we grant Landowners United and Clarence Adams party status.

20.      Notice of Pacific Connector's application was published in the *Federal Register* on June 26, 2013 (78 Fed. Reg. 38,306), establishing July 10, 2013, as the due date for filing motions to intervene and protests.  The parties listed in Appendix B filed timely, unopposed motions to intervene in Docket No. CP13-492-000.[21]  NMFS and Oregon DEQ and Oregon DFW (jointly) also filed timely notices of intervention in Docket No. CP13-492-000.[22]

21.      Late motions to intervene were filed by nine parties in Docket No. CP13-483-000 and by eight parties in Docket No. CP13-492-000.[23]  We grant the late motions to intervene.[24]

22.      Sierra Club filed a protest in Docket Nos. CP13-483-000 and CP13-492-000.  On July 3, 2013, Jordan Cove filed an answer to Sierra Club's protest.  The Commission's Rules of Practice and Procedure do not permit answers to protests and we deny Jordan Cove's answer.[25]

---

[21] Timely, unopposed motions to intervene are granted by operation of Rule 214 of the Commission's Rules of Practice and Procedure.  *See* 18 C.F.R. § 385.214 (2015).

[22] The timely notices of intervention filed by NMFS and the Oregon DEQ and the Oregon DFW are granted by operation of Rule 214(a)(2) of the Commission's Rules of Practice and Procedure and are listed as parties in Appendix B.  18 C.F.R. § 385.214(a)(2) (2015).

[23] In Docket No. CP13-483-000, late motions to intervene were filed by:  Clam Diggers Association of Oregon; Clausen Oysters and Lilli Clausen (as an individual); Coos Bay Oyster Company and Jack Hempell (as an individual); Dennis and Karen Henderson (as individuals and as trustees of the Henderson Revocable Intervivos Trust); Evans Shaaf Family LLC and Deborah Evans and Ronald Schaaf (as individuals); Jerry S. Palmer; John M. Roberts, Jr.; Sierra Club; and Waterkeeper Alliance.  In Docket No. CP13-492-000, late motions to intervene were filed by:  Clam Diggers Association of Oregon; Clausen Oysters and Lilli Clausen (as an individual); Coos Bay Oyster Company and Jack Hempell (as an individual); Dennis and Karen Henderson (as individuals and as trustees of the Henderson Revocable Intervivos Trust); Evans Shaaf Family LLC and Deborah Evans and Ronald Schaaf (as individuals); John F. Caughell and Tammy S. Bray; Stacey and Craig McLaughlin (as individuals); and Waterkeeper Alliance.

[24] 18 C.F.R. § 385.214(d) (2015).

[25] 18 C.F.R. § 385.213(a)(2) (2015).

23.      Specifically, Sierra Club argues that the Jordan Cove LNG Terminal is not consistent with the public interest.  Contrary to Jordan Cove's economic arguments in support of its proposal, Sierra Club states that LNG export will have adverse and wide-ranging effects on the domestic economy and will not result in job creation.  Sierra Club states that the Commission should consider how Jordan Cove's proposal, in addition to all other LNG export proposals, will affect the price of natural gas for domestic customers, as well as how these price increases will harm United States' workers and the economy.  In addition, Sierra Club asserts that the projects will induce additional natural gas production in the United States from traditional and non-traditional sources, causing impacts to air and water quality and wildlife habitats.  Finally, Sierra Club requests that the Commission evaluate the cumulative impacts of all proposed LNG export terminals in a Programmatic Environmental Impact Statement.

24.      Jean Stalcup also filed a protest in Docket No. CP13-492-000.  Ms. Stalcup protests Pacific Connector's pipeline application because, as a landowner, she is concerned that the pipeline right-of-way will cause erosion and environmental damage, harm drainage systems and water supplies, and create a safety risk.  Additionally, many commenters raise similar concerns regarding potential property devaluation resulting from construction damage and maintenance in the permanent pipeline right-of-way.  They also contend that construction and operation of the pipeline will interfere with the use of the lands for farming and timber harvesting operations and the use of waters for oyster farming.

25.      Additionally, on December 10, 2015, Thane W. Tienson filed a letter on behalf of six intervening landowners who will be directly impacted by the Pacific Connector Pipeline (Landowner Letter).[26]  The Landowner Letter argues that the Commission should deny authorization for the pipeline project given the company's admission "that it does not have a single confirmed customer and has only obtained 4.7 [percent] of the right-of-way easement acreage and 2.8 [percent] of the construction easement acreage."  The Landowner Letter states that if the Commission were to authorize the project, Pacific Connector could use the power of eminent domain over approximately 630 landowners; the letter requests that the Commission weigh these impacts against Pacific Connector's failure to execute a single contract for transportation capacity.

---

[26] Bob Barker, John Clarke, Oregon Women's Land Trust, Evans Schaaf Family LLC, Stacey McLaughlin, and Craig McLaughlin.

Docket Nos. CP13-483-000 and CP13-492-000                                    - 12 -

### B.  Request for Formal Hearing

26.     Friends of Living Oregon Waters and Columbia Riverkeeper request that the Commission establish a full evidentiary hearing to determine if:  (1) the proposed project is in the public interest or required for public convenience and necessity; (2) construction and operation of the project would result in significant impacts to water quality; (3) the project would degrade property values; and (4) the applicants provided adequate information regarding the project's impacts.

## IV.  Discussion

### A.  Pacific Connector's Proposed Pacific Connector Gas Pipeline

27.     Since Pacific Connector's proposed pipeline facilities will be used to transport natural gas in interstate commerce subject to the jurisdiction of the Commission, the construction and operation of the facilities are subject to the requirements of NGA sections 7(c) and (e).[27]

#### 1.  Certificate Policy Statement

28.     The Certificate Policy Statement provides guidance for evaluating proposals to certificate new construction.[28]  The Certificate Policy Statement establishes criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest.  The Certificate Policy Statement explains that in deciding whether to authorize the construction of major new pipeline facilities, the Commission balances the public benefits against the potential adverse consequences.  The Commission's goal is to give appropriate consideration to the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new pipeline construction.

29.     Under this policy, the threshold requirement for pipelines proposing new projects is that the pipeline must be prepared to financially support the project without relying on subsidization from its existing customers.  The next step is to determine whether the

---

[27] 15 U.S.C. §§ 717f(c) and 717f(e) (2012).

[28] *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), *order on clarification*, 90 FERC ¶ 61,128, *order on clarification*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).

Docket Nos. CP13-483-000 and CP13-492-000                                        - 13 -

applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, or landowners and communities affected by the route of the new pipeline. If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects. This is essentially an economic test. Only when the benefits outweigh the adverse effects on economic interests will the Commission proceed to complete the environmental analysis where other interests are considered.

### a.    Threshold Requirement – No Subsidization

30.    As noted above, the threshold requirement is that the applicant must be prepared to financially support the project without relying on subsidization from existing customers. Pacific Connector is a new natural gas company and does not have existing customers. Therefore, there will be no subsidization. The Commission finds that Pacific Connector satisfies the threshold requirement of the Certificate Policy Statement.

### b.    Impact on Existing Customers and Pipelines

31.    Once an applicant has satisfied the threshold requirement that its project is financially viable without subsidies, the Commission will consider the effects of the project on three major interests identified in the Certificate Policy Statement as having the potential to be adversely affected by approval of a major certificate project: the interests of the applicant's existing customers, the interests of competing existing facilities and their captive customers, and the interests of landowners and surrounding communities.[29] As stated above, Pacific Connector is a new company proposing to construct and operate a new pipeline; thus, it has no existing customers or services that would be impacted by its current proposal. Additionally, the proposal will not replace firm transportation service on any other pipelines in the market. Therefore, we find that Pacific Connector will not adversely impact existing pipelines in the market or their captive customers.

### c.    Impact on Landowners and Communities

32.    Pacific Connector has made efforts to minimize the adverse effects its project might have on landowners and communities by proposing to locate approximately 95 of the total 232 miles (41 percent) of proposed pipeline adjacent to existing powerlines, roads, and other pipelines. The remaining 59 percent of the route would be constructed

---

[29] Certificate Policy Statement, 88 FERC at 61,747.

Docket Nos. CP13-483-000 and CP13-492-000                                    - 14 -

within newly created right-of-way on land that is primarily forest, with agricultural and rangeland being the next two most predominant land uses.  Approximately 32.1 percent of the pipeline (or 74.5 miles) would cross federal and state lands, while the remaining 67.9 percent of the pipeline (or 157.3 miles) would cross private lands.[30]

33.     Many intervenors and commenters express concern regarding the Pacific Connector Pipeline's potential to adversely impact land valuation, tax revenue, and business operations in the area.  In the Landowner Letter, several intervenors request that the Commission balance Pacific Connector's failure to provide evidence of market demand for the proposed pipeline and its failure to acquire easements along the proposed right-of-way[31] against the impacts to landowners who would face eminent domain actions if the Commission issues a certificate for the pipeline.

34.     The Commission will approve an application for a certificate of public convenience and necessity only if the public benefits from a proposed project outweigh any adverse effects.[32]  The focus of the Commission's analysis under the Certificate Policy Statement is on the impact of a proposed project on the relevant interests balanced against the benefits to be gained from the project.  This is a proportional approach, where the amount of evidence required to establish need will depend on the potential adverse effects of the proposed project.[33]  The more interests adversely affected, or the more adverse impact a project would have on a particular interest, the greater the showing of need and public benefits required to balance the adverse impact.[34]

35.     The Certificate Policy Statement describes a situation where sponsors of a new company proposing to serve a new, previously unserved market "are able to acquire all, or substantially all, of the necessary right-of-way by negotiation prior to filing the application" and explains that "[s]uch a project would not need any additional indicators

---

[30] *See* Final Environmental Impact Statement at 2-32 and 4-12.

[31] Pacific Connector has not submitted evidence that it has obtained any easement or right-of-way agreements for the necessary use of private lands.

[32] Certificate Policy Statement, 90 FERC at 61,389, 61,396.

[33] *Arlington Storage Co., LLC*, 128 FERC ¶ 61,261, at P 7 (2009); *Transcontinental Gas Pipe Line Corp.*, 120 FERC ¶ 61,181, at P 90 (2007); *Midwestern Gas Transmission Co.*, 116 FERC ¶ 61,182, at P 37 (2006).

[34] Certificate Policy Statement, 88 FERC at 61,749.

of need . . . [since] landowners would not be subject to eminent domain proceedings."[35] The Certificate Policy Statement goes on to recognize that it may not be possible for a sponsor to acquire all the necessary right-of-way by negotiation, stating that:

> [T]he company might minimize the effect of the project on landowners by acquiring as much right-of-way as possible.  In that case, the applicant may be called upon to present some evidence of market demand, but under this sliding scale approach the benefits needed to be shown would be less than in a case where no land rights had been previously acquired by negotiation.[[36]]

36.     The Certificate Policy Statement allows an applicant to rely on a variety of relevant factors to demonstrate need, rather than requiring evidence that a specific percentage of the proposed capacity is subscribed under long-term precedent or service agreements.[37]  These other factors might include, but are not limited to, precedent agreements, demand projections, potential cost savings to consumers, or a comparison of projected demand with the amount of capacity currently serving the market.[38]  The Commission stated that it will consider all such evidence submitted by the applicant reflecting on the need for the project.  Nonetheless, the Certificate Policy Statement made clear that, although submittal of precedent agreements is no longer required, they are still significant evidence of need or demand for a project.[39]

37.     In *Turtle Bayou Gas Storage Company, LLC* (*Turtle Bayou*),[40] the Commission denied Turtle Bayou's application to construct and operate a natural gas storage facility, finding that it failed to meet the criteria of the Certificate Policy Statement.  As a new company with no existing customers, Turtle Bayou met the threshold requirement of no subsidization.  However, as evidence of public benefits, Turtle Bayou presented only general assertions of a need for natural gas storage at the regional and national level. There was no evidence that any of the proposed capacity had been subscribed under

---

[35] *Id.* at 61,748.

[36] *Id.* at 61,749.

[37] *Id.* at 61,747.

[38] *Id.*

[39] *Id.*

[40] 135 FERC ¶ 61,233 (2011).

precedent agreements.  At the same time, the record showed that Turtle Bayou owned virtually none of the property rights which would be necessary to develop its project. Having been unable to acquire those rights through negotiation with the single landowner, it appeared that Turtle Bayou would have to obtain them through exercise of the right of eminent domain provided by a Commission certificate.  Given these circumstances, the Commission found that "[t]he generalized showing [of project need] made by Turtle Bayou does not outweigh the impact on the landowner that holds the majority of property rights needed to develop the proposed project ... Therefore, we cannot find that Turtle Bayou's proposed project is required by the public convenience and necessity, and we deny its request for certificate authority to construct and operate its project."[41]

38.    In this case, the Pacific Connector Pipeline will impact 157.3 miles of privately-owned lands, held by approximately 630 landowners (54 of which have intervened).  As stated above, the landowners contend that the pipeline will have negative economic impacts, such as land devaluation, loss of tax revenue, and economic harm to business operations (e.g., oyster and timber harvesting and farming).  While we cannot predict the outcome of the eventual negotiations, it currently appears that at least some portion of the necessary property rights will need to be obtained through the exercise of eminent domain.[42]  The Certificate Policy Statement makes clear that holdout landowners cannot veto a project that the Commission finds is required by the public convenience and necessity after balancing all relevant factors and considerations.[43]  However, "the strength of the benefit showing will need to be proportional to the applicant's proposed exercise of eminent domain procedures."[44]

39.    Here, Pacific Connector has presented little or no evidence of need for the Pacific Connector Pipeline.  Pacific Connector has neither entered into any precedent agreements for its project, nor conducted an open season, which might (or might not) have resulted in "expressions of interest" the company could have claimed as indicia of demand.  As it stands, Pacific Connector states that the pipeline will benefit the public by delivering gas supply from the Rocky Mountains and Canada to the Jordan Cove LNG Terminal and by providing an additional source of gas supply to communities in southern Oregon (though,

---

[41] *Id.* at 34.

[42] Pacific Connector has not filed any negotiated agreements to access private property along the pipeline's route.

[43] Certificate Policy Statement, 88 FERC at 61,749.

[44] *Id.*

again, it has presented no evidence of demand for such service). Pacific Connector also contends that construction of the pipeline and LNG terminal will create temporary construction jobs and full-time operation jobs and millions of dollars in property, sales, and use taxes to state and local governments. Finally, Pacific Connector contends that the Commission has previously found that the benefits provided by pipelines that deliver feed gas to export terminals outweigh the minimal adverse impacts and such projects are required by the public convenience and necessity.[45]

40.     Pacific Connector is essentially asking the Commission to rely on DOE's finding that authorization of the commodity export is consistent with the public interest as sufficient to support a finding by the Commission that the Pacific Connector pipeline is required by the public convenience and necessity, as there is no other proposed way for gas to be delivered to the Jordan Cove LNG Terminal for export. Additionally, Pacific Connector emphasizes that neither the pipeline nor the terminal will be constructed unless and until customers ultimately subscribe to a significant portion of the capacity of the facilities. The Commission has not previously found a proposed pipeline to be required by the public convenience and necessity under NGA section 7 on the basis of a DOE finding under NGA section 3 that the importation or exportation of the commodity natural gas by an entity proposing to use the services of an associated LNG facility is consistent with the public interest.[46] Nor has the Commission relied solely on the fact

---

[45] Pacific Connector's statement is misleading because the facts presented in its cited cases differ greatly from the facts here. In *Dominion Cove Point LNG, LP*, 148 FERC ¶ 61,244 (2014), *reh'g denied*, 151 FERC ¶ 61,095 (2015), the proposed pipeline was fully contracted and would be constructed entirely on Dominion-owned land and/or right-of-ways. *Dominion Cove Point LNG, LP*, 148 FERC ¶ 61,244 at P 58. Similarly, in *Cheniere Creole Trail Pipeline, L.P.*, 142 FERC ¶ 61,137 (2013), the proposed pipeline was fully subscribed and did not need new right-of-way or easements for construction. *Id.* at PP 13 and 31.

[46] DOE's order did not purport to consider any issues related to the Pacific Connector Pipeline. While the regulatory functions of section 3 of the NGA (relating to the import and export of natural gas) were transferred to the Secretary of Energy (Secretary) in 1977 pursuant to section 301(b) of the Department of Energy Organization Act, 42 U.S.C. § 7151(b) (2006), the regulatory functions of section 7 (relating to the sale for resale and transportation of natural gas in interstate commerce) were transferred to and vested in the Commission pursuant to section 402(a)(1)(D) of that Act. 42 U.S.C. § 7172(a)(1)(D) (2006). Further, while the Secretary retained authority to authorize imports and exports of the commodity natural gas under section 3, the Secretary subsequently delegated to the Commission the authority to approve or disapprove the construction and operation of particular facilities, the site at which facilities shall be

(continued…)

Docket Nos. CP13-483-000 and CP13-492-000                                    - 18 -

that a company is not likely to proceed with construction of facilities in the absence of a market for a project's services – particularly in the face of significant opposition from directly-impacted landowners.  Further, while the Commission could ensure avoidance of unnecessary environmental impacts by including a certificate condition providing that authorization for the commencement of construction would not be granted until Pacific Connector has successfully executed contracts for a certain level of service, the right to eminent domain is inherent in a certificate issued under NGA section 7.  Thus, the Commission's issuance of a certificate would allow Pacific Connector to proceed with eminent domain proceedings in what we find to be the absence of a demonstrated need for the pipeline.

41.     We find the generalized allegations of need proffered by Pacific Connector do not outweigh the potential for adverse impact on landowners and communities.

### d.     Certificate Policy Statement Conclusion

42.     Because the record does not support a finding that the public benefits of the Pacific Connector Pipeline outweigh the adverse effects on landowners, we deny Pacific Connector's request for certificate authority to construct and operate its project, as well as the related blanket construction and transportation certificate applications.

### B.     Jordan Cove's Proposed LNG Terminal

43.     The Jordan Cove LNG Terminal and the Pacific Connector Pipeline, though requiring authorization under different sections of the NGA, have been proposed as two segments of a single, integrated project.  As described above, Pacific Connector has stated that although its pipeline will be capable of delivering gas to markets in southern Oregon through an interconnection with Northwest's Grant Pass Lateral, it will not build the project unless the Jordan Cove LNG Terminal Project goes forward.[47]  Similarly, without a source of natural gas, proposed here to be delivered by the Pacific Connector Pipeline, it will be impossible for Jordan Cove's liquefaction facility to function.

---

located, and with respect to natural gas that involves the construction of new domestic facilities, the place of entry for imports or exit for exports.  The Secretary's current delegation of authority to the Commission relating to import and export facilities was renewed by the Secretary's DOE Delegation Order No. 00-044.00A, effective May 16, 2006.

[47] *See* Pacific Connector's Application at 7 and 9, and Pacific Connector's June 1, 2015 Data Response at 2.

44.     As discussed above, in determining whether a proposed project will serve the public interest under the Certificate Policy Statement, the Commission balances the public benefits of a proposed project against the potential adverse consequences.  While the Certificate Policy Statement does not specifically apply to facilities authorized under NGA section 3, the Commission is still required to conclude that authorization of such facilities will not be inconsistent with the public interest.[48]  We find that without a pipeline connecting it to a source of gas to be liquefied and exported, the proposed Jordan Cove LNG Terminal can provide no benefit to the public to counterbalance any of the impacts which would be associated with its construction.

45.     The Commission has not previously authorized LNG export terminal facilities without a known transportation source of natural gas.[49]  Here, the Pacific Connector

---

[48] *See AES Sparrows Point LNG, LLC,* 126 FERC ¶ 61,019, at n.21 (2009), where the Commission noted that the rationale of balancing benefits against burdens to determine the public interest is the same in both types of proceedings.

[49] *Corpus Christi Liquefaction, LLC and Cheniere Corpus Christi Pipeline, L.P.*, 149 FERC ¶ 61,283 (2014), *reh'g denied*, 151 FERC ¶ 61,098 (2015) (order granting authorization under NGA section 3 to construct and operate import and export facilities located in San Patricio and Nueces Counties, Texas, and issuing a certificate to construct and operate a 23-mile-long pipeline in San Patricio County, Texas to transport natural gas bi-directionally between the liquefaction project and existing interstate and intrastate natural gas pipeline systems); *Dominion Cove Point LNG, LP*, 148 FERC ¶ 61,244 (2014), *reh'g denied*, 151 FERC ¶ 61,095 (2015) (order granting authorization under NGA section 3 to construct and operate liquefaction facilities at the company's existing LNG terminal in Calvert County, Maryland, to export domestically-produced natural gas supplied by the company's pipeline facilities); *Freeport LNG Development, L.P., FLNG Liquefaction, LLC, FLNG Liquefaction 2, LLC, and FLNG Liquefaction 3, LLC*, 148 FERC ¶ 61,076 (2014), *reh'g and clarification denied*, 149 FERC ¶ 61,119 (2014)  (order granting authorization under NGA section 3 to construct and operate natural gas pretreatment facilities and several interconnecting pipelines to support liquefaction and export operations at the company's existing LNG terminal in Freeport, Texas); *Cameron LNG, LLC and Cameron Interstate Pipeline, LLC*, 147 FERC ¶ 61,230 (2014), *reh'g rejected*, 148 FERC ¶ 61,073 (2014), *reh'g denied*, 148 FERC ¶ 61,237 (2014) (order granting authorization under NGA section 3 to construct and operate export facilities at the company's existing LNG import terminal in Cameron, Louisiana, and issuing a certificate to construct and operate a pipeline and compression facilities to transport domestically-produced gas to the LNG terminal for liquefaction and export); *Sabine Pass Liquefaction, LLC and Sabine Pass LNG, L.P.*, 139 FERC ¶ 61,039 (2012) (order granting NGA section 3 authorization to construct and operate liquefaction facilities to

(continued…)

Pipeline is the only proposed transportation path for natural gas to reach the Jordan Cove LNG Terminal.

46.     Because the record does not support a finding that the Jordan Cove LNG Terminal can operate to liquefy and export LNG absent the Pacific Connector Pipeline, we find that authorizing its construction would be inconsistent with the public interest. Therefore, we also deny Jordan Cove's request for authorization to site, construct and operate the Jordan Cove LNG Terminal.**[50]**

## V.    **Conclusion**

47.     Given this action, we dismiss as moot the environmental concerns raised by Sierra Club in its protest.**[51]**  Likewise, Friends of Living Oregon Waters' and Columbia Riverkeeper's requests for a formal hearing on the application are moot.

---

export domestically-produced natural gas received from two interstate pipeline interconnected with the company's existing LNG terminal); and *Sabine Pass LNG, L.P.*, 127 FERC ¶ 61,200 (2012), *reh'g denied*, 140 FERC ¶ 61,076 (2012) (order amending authorization under NGA section 3 to allow Sabine Pass LNG, L.P. to export LNG that had been previously imported and stored in its liquid form at its existing Sabine Pass Liquefied Natural Gas Terminal located in Cameron Parish, Louisiana).

**[50]** We acknowledge that pursuant to its authority under NGA section 3, DOE's Office of Fossil Energy (DOE/FE) issued Jordan Cove authorization to export 15 MPTA, or 2.0 Bcf/d, of domestically produced natural gas by vessel to all free trade agreement (FTA) and non-FTA nations, finding that the potential export of such volumes to not be inconsistent with the public interest.  *See* DOE/FE Order No. 3041 (December 7, 2011) (authorizing Jordan Cove to export 9 MMTA or 1.2 Bcf/d of natural gas to FTA nations for a 30-year term) and DOE/FE Order No. 3413 (March 24, 2014) (conditionally authorizing Jordan Cove to export 6 MMTA or 0.8 Bcf/d of natural gas to non-FTA nations for a 20-year term).  In granting Jordan Cove long-term authorization to export LNG, DOE/FE found that there was substantial evidence of economic and other public benefits such that the authorization was not inconsistent with the public interest. However, as stated, we view the Jordan Cove Project as an integrated project, comprising both the terminal and the pipeline.  Accordingly, since we are denying authorization for the Pacific Connector Pipeline as proposed, we are also denying our authorization for the Jordan Cove LNG Terminal.

**[51]** Additionally, we dismiss as moot the Confederated Tribes of Coos, Lower Umpqua, and Siuslaw Indians' February 22, 2016 request for an additional 30 days to comment on the Pacific Connector Pipeline Project Cultural Resources Survey.

Docket Nos. CP13-483-000 and CP13-492-000                                        - 21 -

48.    Our actions here are without prejudice to Jordan Cove and/or Pacific Connector submitting a new application to construct and/or operate LNG export facilities or natural gas transportation facilities should the companies show a market need for these services in the future.

49.    The Commission, on its own motion, received and made part of the record in these proceedings all evidence, including the applications and exhibits thereto, submitted in support of the authorizations sought herein, and upon consideration of the record,

The Commission orders:

    (A)    In Docket No. CP13-492-000, Pacific Connector's request for a certificate of public convenience and necessity under section 7(c) of the NGA to construct and operate an approximately 232-mile-long, 36-inch-diameter pipeline is denied.

    (B)    In Docket No. CP13-483-000, Jordan Cove's request for authorization under section 3 of the NGA to site, construct, and operate its LNG terminal in Coos Bay County, Oregon is denied.

    (C)    The untimely motions to intervene are granted as discussed herein.

    (D)    Jordan Cove's July 3, 2013 answer is denied.

    (E)    The Friends of Living Oregon Waters' and Columbia River Clean Energy Coalition's requests for an evidentiary hearing are dismissed as moot.

By the Commission.

( S E A L )




                                        Nathaniel J. Davis, Sr.,
                                        Deputy Secretary.

**Appendix A**

**Interventions in Docket No. CP13-483-000**
*out of time


Blue Ridge Alternate Route 2013
Bob Barker
C-2 Cattle Company
Cascadia Wildlands and Oregon Wild
Center for Biological Diversity
Citizens Against LNG, Inc; Citizens Against LNG; & Jody McCaffree (as an individual)
Clam Diggers Association of Oregon*
Clausen Oysters and Lilli Clausen (as an individual)*
Columbia Riverkeeper
Confederated Tribes of the Coos, Lower Umpqua, and Siuslaw Indians
Coos Bay Oyster Company and Jack Hempell (as an individual)*
Coos County Sheep Company and Dustin A Clarke (as an individual)
David McGriff
Dennis and Karen Henderson (as individuals and as trustees of the Henderson Revocable Intervivos Trust)*
Evans Schaaf Family LLC and Deborah Evans and Ronald Schaaf (as individuals)*
Food & Water Watch
Fred Messerle & Sons, Inc.
Friends of Living Oregon Waters
Holly Hall Stamper
James R. Davenport
Jean Stalcup
Jerry S. Palmer*
Jonathan M. Hanson
John M. Roberts, Jr.*
Klamath-Siskiyou Wildlands Center
Landowners United and Clarence Adams (as an individual)
LNG Development Company, LLC (d/b/a/ Oregon LNG) and Oregon Pipeline Company, LLC
Marcella and Alan Laudani
Mark Sheldon
National Marine Fisheries Service
Northwest Industrial Gas Users
Nova Lovell
Oregon Coast Alliance
Oregon Department of Energy
Oregon Department of Environmental Quality and the Oregon Department of Fish and

Wildlife (jointly)
Oregon Department of Land Conservation and Development
Oregon Shores Conservation Coalition
Oregon Women's Land Trust
Pacific Coast Federation of Fisherman's Associations and the Institute for Fisheries
Resources (jointly)
Richard F. Knablin
Rogue Riverkeeper
Sherry M Church
Sierra Club*
State of Wyoming
Waterkeeper Alliance*
Western Environmental Law Center
Wyoming Pipeline Authority

## Appendix B

## Interventions in Docket No. CP13-492-000
*out of time


Bill Gow
Blue Ridge Alternate Route 2013
Bob Barker
C-2 Cattle Company
Cascadia Wildlands and Oregon Wild
Center for Biological Diversity
Citizens Against LNG, Inc.; Citizens Against LNG; and Jody McCaffree (as an individual)
Clam Diggers Association of Oregon*
Clausen Oysters and Lilli Clausen (as an individual)*
Columbia Riverkeeper
Confederated Tribes of the Coos, Lower Umpqua, and Siuslaw Indians
Coos Bay Oyster Company and Jack Hempell (as an individual)*
Coos County Sheep Company and Dustin A Clarke (as an individual)
Curtis Pallin
Daniel Fox
David McGriff
David Messerle
Dee Willis
Dennis and Karen Henderson (as individuals and as trustees of the Henderson Revocable Intervivos Trust)*
Evans Schaaf Family LLC and Deborah Evans and Ronald Schaaf (as individuals)*
Food & Water Watch
Fred Messerle & Sons, Inc.
Friends of Living Oregon Waters
Gary Gunnell
Gas Transmission Northwest LLC
Jake Robinson
James R. Davenport
Jason Messerle
Jean Stalcup
Jeff Messerle
Jennifer LM Barrows and Richard A Barrows
John Caughell
John Clarke
John F. Caughell and Tammy S Bray*
John M. Roberts, Jr.

John Muenchrath
John Szymik
Jonathan M. Hanson
Joseph P Quinn
Karen Solomon
Klamath-Siskiyou Wildlands Center
Landowners United and Clarence Adams (as an individual)
LNG Development Company, LLC (d/b/a Oregon LNG)
Marcella and Alan Laudani
Mark Sheldon
National Marine Fisheries Service
Northwest Industrial Gas Users
Nova Lovell
Oregon Coast Alliance
Oregon Department of Energy
Oregon Department of Environmental Quality and the Oregon Department of Fish and
Wildlife (jointly)
Oregon Department of Land Conservation and Development
Oregon Shores Conservation Coalition
Oregon Women's Land Trust
Pacific Coast Federation of Fisherman's Associations and the Institute for Fisheries
Resources (jointly)
Paul M Washburn
Process Gas Consumers Group
Rogue Riverkeeper
Ronald L Foord
Ruby Pipeline
Seneca Jones Timber Company, LLC
Shane Johnson
Sierra Club
Stacey and Craig McLaughlin (as individuals)*
State of Wyoming
Southwest Gas Corporation
Victor Elam
Waterkeeper Alliance*
Western Environmental Law Center
Will Wright
Wyoming Pipeline Authority